[Civ. No. 26954.   Second Dist., Div. One.   Jan. 28, 1964.]

OSTEOPATHIC PHYSICIANS AND SURGEONS OF CALIFORNIA et al., Plaintiffs and Appellants, v. CALIFORNIA MEDICAL ASSOCIATION et al., Defendants and Respondents.

380

Steinmetz, Murrish & Richman, Steinmetz & Murrish, William B. Murrish, Fred H. Steinmetz and Matthew M. Richman for Plaintiffs and Appellants.

Beardsley, Hufstedler & Kemble, Charles E. Beardsley, Seth M. Hufstedler, Peart, Baraty & Hassard, Howard Hassard, Overton, Lyman & Prince and Holmes E. Hobart for Defendants and Respondents.

WOOD, P. J.—There are six alleged causes of action in the amended and supplemental complaint, as amended (referred to herein as the complaint). Defendants' motion for judgment on the pleadings as to the first cause of action (for declaratory relief) was granted, and a declaratory judgment in favor of defendants on that cause of action was entered. Defendants' general demurrers to the five other causes of action were sustained without leave to amend. (When the judge asked if they wished to amend, they did not request such permission.) Judgment of dismissal as to those causes of action was entered. Plaintiffs appeal from the judgment.

The principal basis for the action is the unification or merger agreement entered into between the California Medical Association (referred to as CMA) and the California Osteopathic Association (referred to as COA).

The plaintiffs are Osteopathic Physicians and Surgeons of California, a nonprofit California corporation,[1] and 18 doc-

---

[1]Organized in December 1960 — the new local division of the American Osteopathic Association, which division succeeded the California

tors of osteopathy who were opposed to unification of the two professions.

The defendants are the California Medical Association, the California Osteopathic Association, the College of Osteopathic Physicians and Surgeons, and several doctors of medicine, doctors of osteopathy, and other persons who were officials or agents of these two associations or of the college.

The first four paragraphs of the complaint, comprising about seven pages of the clerk's transcript, contain allegations relative to the identification of the parties. It is also alleged in those paragraphs that the defendant California Osteopathic Association, which was incorporated in 1900, receives annual dues from its members amounting to approximately $450,000; it has cash reserves in excess of $717,000, and has real property and other personal property of a value in excess of $1,500,000; it was organized and existed until May 1960 (time of merger) for the sole purpose of maintaining a standard of education and promoting the welfare and influence of the profession of osteopathy; all of the individual plaintiffs (except the ones allegedly expelled) are and for many years have been members of said defendant COA and entitled to all the rights and privileges of membership therein.

It was also alleged in those four paragraphs that defendant College of Osteopathic Physicians and Surgeons was incorporated in 1914 for the principal purpose of maintaining an osteopathic medical and surgical college; from the date of incorporation until May 1961 it accumulated property of the present market value of more than $5,000,000; it receives income from its operation and from investments in excess of $750,000 a year, but its expense of educational operations exceeds $950,000 a year, requiring other income in the approximate minimum amount of $200,000 a year which is supplied by donations.

It was further alleged therein that the American Medical Association is the national organization of allopathic physicians and surgeons; defendant CMA is the constituent society of AMA for California; the Los Angeles County Medical Association is the subordinate local society under CMA; in California there are approximately 23,000 allopathic physi-

Osteopathic Association as such local division when it allegedly was expelled by the American Osteopathic Association for entering into the merger agreement.

cians and surgeons of which number approximately 17,000 are members of AMA. The American Osteopathic Association represents the profession of osteopathy in the United States; osteopathic physicians and surgeons in California are eligible for membership in AOA, and all the individual plaintiffs and defendants who are osteopaths are and have been members of AOA.

The first cause of action alleges, among other things, that: The allegations of the first four paragraphs of the complaint are realleged therein. An actual controversy exists between plaintiffs and defendants (except certain trustees of the college—COPS) concerning the construction and validity of the purported merger agreement. That agreement was signed by officers of COA and CMA about March 11 and 18, 1961, respectively, and purportedly ratified by the CMA delegates on May 3, 1961, and by the COA delegates on May 17, 1961. Defendant COPS (college) accepted the agreement by resolution of its board of trustees on May 24, 1961. Osteopathy is a separate school of the healing art and profession, embracing education equal in scope in all respects to allopathic medicine, but differing fundamentally therefrom by force of vital features of special emphasis, including emphasis on functions of musculoskeletal structure, and on natural curative resources, and manipulative therapy. The provisions of California law governing physicians and surgeons are equally applicable to osteopaths and allopaths, except that under a 1922 initiative measure the licensing and discipline of osteopaths is vested in the Board of Osteopathic Examiners rather than in the Board of Medical Examiners. One out of every twenty physicians and surgeons in the United States is an osteopath, and in California the ratio is about one in ten. (There are allegations regarding: osteopathy as nationally organized; the number of osteopathic hospitals in the United States and in California; the osteopathic schools which are being operated; comparable standards of osteopaths and allopaths in certifying hospitals and medical specialists; comparable publications and research of the two professions; the similarities and differences in the teaching of the two professions; the degree of D.O. being granted by osteopathic schools, and the degree of M.D. being awarded by medical schools; the public significance of those degrees with respect to the amount of training and education required to obtain them; competition and elimination of osteopathy have been threatened and

attempted by the activities of defendants herein complained of.)

Since 1959 all defendants (except certain COPS trustees) have conspired and agreed to do the following things in California: to eliminate the osteopathic profession; to prevent competition in the practice of medicine and to control and monopolize such practice, by combining their capital and power; to restrain the trade and property rights of all osteopathic doctors, teachers of osteopathy, and schools and hospitals teaching osteopathy, who might decline to join the concert of action of defendants; to cause to be eliminated as an osteopathic medical college the only osteopathic medical school in California, the defendant COPS, and to convert it to an allopathic medical college; to cause said college to issue, barter and sell medical degrees; to all such ends to employ funds and properties of COA in manners violating its charter and violating law. Said conspiracy is one to restrain and to monopolize trade within the meaning of division 7, part 2, chapter 2, of the Business and Professions Code (§§ 16700 et seq. — entitled ''Combinations in Restraint of Trade''). From the outset of osteopathy in 1871 the AMA, on behalf of the allopathic profession, has falsely branded the osteopathic profession as a ''cultist'' medical practice, and has condemned all osteopathic doctors as pseudopractitioners, inadequately educated, and unfit to be regarded as physicians and surgeons. Since the inception of osteopathy, the allopathic profession, including AMA and CMA, has publicly demanded and advocated: public distrust of osteopathic medical care; legal refusal of licensure rights to osteopathic doctors; and a complete professional boycott against all osteopathic doctors by all medical doctors. Although CMA and certain of its coconspirators may have believed that osteopathy was ''cultist'' and educationally inferior to allopathic medicine, none of them has had such belief for many years and since an unknown date prior to 1953, and notwithstanding such lack of belief, they have persisted in maintaining said boycott on the pretext that osteopathy is cultist and educationally inferior, and CMA has conditionally offered and agreed to relax the boycott only as to presently certificated California osteopaths. By force of rules of ethics of the allopathic profession, virtually all members of AMA and CMA have been constrained to refuse all professional associa-

tion with any osteopathic doctor; and the boycott with respect to hospitals has been virtually total, except for government owned hospitals. By force of the nonassociation boycott, not more than 5 per cent of the hospitals permit an osteopathic doctor to admit any patient thereto for his care. Although such boycott has hindered and harrassed osteopathic doctors, it has not succeeded in eliminating competition by osteopaths or achieving for the allopathic profession a total monopoly of the business of medical care. Osteopathy has made substantial progress in public acceptance, number of practitioners and patients, and educational and hospital facilities. Over a period of more than 10 years, there developed within the AMA a considerable body of opinion which favored an accommodation between the two professions by reason of such factors as: increased awareness of the falsity of the AMA campaign against osteopathy; increased legal status of osteopaths; and realization that the boycott has failed to accomplish its purpose of eliminating osteopathy and securing a monopoly for the allopathic profession. As early as 1951, at meetings of AMA delegates, state delegations have proposed relaxation of the AMA boycott and the adoption of a policy of toleration of the osteopathic profession. The AMA made no change in its policy toward osteopathy until June 1961 when it acted to delegate to its state organizations the enforcement of its boycott, and thereby it encouraged adoption of the "California Plan." That plan is a negation of all previous proposals for accommodation between the professions on a mutually tolerant basis, and that plan provides that practicing osteopaths shall abandon osteopathy, and shall practice as allopaths under the "M.D." description under color of such fictitious degrees to be procured for them, conceal their osteopathic background, join the CMA, dissolve their own COA, transfer its assets to COPS (college), and cause COPS to convert to an allopathic medical school. In 1953 an AMA committee, after meeting with an AOA committee, recommended to the AMA delegates that it declare that it does not classify the teaching of osteopathy as the teaching of a cultist healing. The delegates rejected the recommendation. In 1955 the AMA delegates approved a report that all voluntary professional association with osteopaths is unethical, and that it was incumbent on AMA members to observe the existing policy of nonassociation. Since the emergence of the "California Plan" of eliminating oste-

opathy, national negotiations with respect to promoting mutual toleration have made no progress.

The said first cause of action alleges further: that the "Merger Agreement" provides that: COA agrees to change its name to Forty-first Medical Society or some other approved name, to apply to CMA for a charter therefor, and later to dissolve and to transfer its assets to COPS which by that time will have been converted to an allopathic school. Defendant CMA will amend its organization papers to provide for taking members of COA into membership. COA will negotiate a contract with COPS whereby it will change its name by eliminating the word "osteopathic," and will issue the "M.D." degree to licensed California osteopaths without any examination and without attending the college, and such degree will be recognized as an M.D. degree issued by an accredited medical school for all purposes. Defendant COA for itself and its successor agrees for a period of five years to make financial contributions of at least $225,000 annually to COPS. Defendant CMA guarantees to COPS that during the five-year period following the merger the annual minimum contribution of $225,000 will be received by COPS. The parties agree that the existing boycott shall be lifted only as to California osteopathic doctors who acquire the M.D. degree. The parties agree to promote legislation to terminate the licensing of osteopathic doctors in California, to repeal the Osteopathic Initiative Act and abolish the Board of Osteopathic Examiners, and to require doctors holding both the M.D. and D.O. degrees to make an election to practice under one of them exclusively.

The first cause of action alleged further: The continued enforcement of the AMA boycott during the negotiations for and the execution of the merger agreement constituted a material and inducing cause thereof. The California Plan appeared to represent an opportunity for California osteopaths to escape from the continuing enforcement of the boycott, although the plan was upon conditions imposed by CMA whereby the osteopaths were required to renounce osteopathy, join the conspiracy of AMA, and to aid in a program of eliminating osteopathy in California. In 1959, while the merger agreement was being negotiated, the AMA Judicial Council made a report to the AMA delegates recommending that it should not be considered unethical for members of the AMA to associate with physicians, other than doctors of med-

icine, who were licensed to practice the healing art without limitation; nor to teach students of osteopathic medicine who seek to improve their ability to provide better medical care. At the urging of the CMA delegation the recommendation regarding association was rejected, and the other recommendation was modified to read that it shall not be unethical for doctors of medicine to teach students in an osteopathic college which is being converted to an approved medical school. Said action of the AMA delegates was taken for the purpose of maintaining the pressure of the boycott on COA and California osteopaths in order to induce them to accept the merger agreement. The effect of the actions of AMA is that the boycott remains in effect, and that California osteopaths who elect not to acquire M.D. degrees and practice thereunder as provided in the merger agreement will remain subject to the boycott, except that if the agreement is performed the boycott will be enhanced by the fact that osteopathic doctors who do elect to acquire such degrees and join CMA will be required to join the boycott and refrain from association with their former associates, and those osteopathic doctors who do not so elect will be excluded from former osteopathic hospitals whose staffs include former osteopathic doctors. For the purpose of escaping the boycott and of practicing as doctors in a manner tolerated by AMA and CMA, the officers of COA decided in 1959 or early in 1960 to abandon osteopathy, to join the conspiracy, to promote acceptance of the agreement, and to use the property and franchise of COA in aid of the program of eliminating competition by osteopaths in California. The board of trustees of COA approved the merger agreement on March 11, 1961. The delegates of COA ratified the agreement on May 17, 1961. Thereafter, COA induced COPS to agree to the merger, to eliminate the word "osteopathic" from its name, and to begin conversion to a medical school. Because COA participated in such program, the AOA revoked the charter of the defendant COA on November 20, 1960, and issued a charter to plaintiff Osteopathic Physicians and Surgeons of California as the California divisional society of AOA for the purpose of protecting osteopathy in California. Certain of the individual plaintiffs joined plaintiff OPSC. With the purpose of preventing opposition to the merger agreement and discouraging membership in OPSC, the trustees of COA on January 3, 1961, adopted "rule 41" which provides for expulsion from

membership anyone who retains membership in any California osteopathic organization having policies contrary to COA. Under such rule COA has purported to expel certain individual plaintiffs herein. Such expulsion subjects such persons to discriminatory exclusion from osteopathic hospitals.

The first cause of action alleged further: The acts of COA and its officers were ultra vires and in excess of the corporate powers of COA as defined in its articles of incorporation adopted in 1900. In May 1961, after ratification of the merger agreement, the COA delegates purportedly amended said articles by initiating steps to add a provision stating: "The ... purpose includes the unification of all those medical practitioners ... in one medical association, the promotion of the accreditation of the College of Osteopathic Physicians and Surgeons as an approved medical school ... and the free interchange of ideas ... among all licensed physicians and surgeons in ... California." Since the execution of the merger agreement, the CMA has threatened to interpret the agreement as requiring further training and examinations of all osteopaths as a condition to granting of "M.D." degrees by COPS. Defendants CMA and COPS accepted and entered into the agreement after this action was commenced and with knowledge of its pendency. The agreement, the negotiations leading up to it, and the performance thereof constituted the purchase, sale, and barter of medical degrees and diplomas; constituted the use of purchased diplomas within the meaning of sections 2386 and 2427 of the Business and Professions Code; constituted the selling and bartering of diplomas within the meaning of section 29012 of the Education Code; constituted conspiring to obtain by barter diplomas within the meaning of section 29013 of the Education Code; constituted the use, in connection with a profession, of degrees or diplomas which have been obtained by barter within the meaning of section 29014 of the Education Code; and constituted, within the meaning of section 29015 of the Education Code, the giving and using, in connection with a profession, diplomas evidencing the completion of a course of study, when in fact such course was not undertaken or completed. The use of the suffix "M.D." by persons who have not received a degree of doctor of medicine after completion of a full course of study as prescribed by an approved medical school is unlawful under section 2430 of the Business and Professions

Code and constitutes unprofessional conduct within the meaning of section 2396 of said code. The amendment of said section 2396 in 1961 is ineffective to authorize the use of the suffix "M.D." by osteopathic doctors as contemplated by the agreement. It is contemplated by the agreement that osteopaths who obtain the degree of "M.D." as provided in the agreement will in connection with their practice hold themselves out to the public as doctors of medicine. That such use of that degree and diploma will be misleading within the meaning of section 17500 of the Business and Professions Code. Plaintiffs contend that: the merger agreement is unlawful and void under the Cartwright Antitrust Law (Bus. & Prof. Code, §§ 16700 et seq.), as well as under the common law, both as a product of past restraints of trade and as a device for continuing restraints of trade; the agreement is ultra vires as to COA; the agreement constitutes unlawful purchase, barter and sale of medical degrees; the agreement provides for the "unlawful misuse" of the suffix "M.D."; and provides for the making of misleading statements to the public concerning professional services. The defendants contest the foregoing contentions. Plaintiffs desire a declaration of their rights and duties with respect to defendants in relation to the existing controversy, including a determination of the construction and validity of the merger agreement.

The second cause of action alleges, among other things, that: The allegations of the first cause of action are realleged therein, except allegations regarding ultra vires, and selling and using degrees and diplomas. Each defendant (except certain trustees of COPS who disagree with the conspiracy) has intended to accomplish the objectives alleged herein and the overt acts committed and threatened to effectuate the conspiracy, and has acted wilfully in all such respects. As a proximate result of said conspiracy and acts in furtherance thereof, including the boycott, each individual plaintiff has suffered damage to his professional practice in an amount which is at least $10,000. Under section 16750 of the Business and Professions Code, each individual plaintiff is entitled to recover treble damages. Defendants have been guilty of oppression, fraud, and malice toward the individual plaintiffs who are entitled to recover $5,000 exemplary damages. Unless plaintiffs are granted injunctive relief they will suffer irreparable damage and injury.

The third cause of action alleges, among other things, that:

The allegations of the first cause of action are realleged therein, except allegations regarding desirability of declaration of rights. The individual plaintiffs, as members of COA, are authorized under section 803 of the Corporations Code, to bring an action to enjoin the doing of unauthorized business by COA.

The fourth cause of action alleges, among other things, that: The allegations of the first cause of action are realleged therein, except allegations regarding ultra vires and selling degrees and diplomas. The individual plaintiffs, as persons holding physicians' and surgeons' licenses, being more than 10 in number, are authorized by section 2436 of the Business and Professions Code to apply for an injunction to restrain any acts which constitute an offense against chapter 5, division 2, of the Business and Professions Code.

The fifth cause of action, which is labeled "(Misuse of Term or Suffix 'M.D.')" realleges the allegations of the first cause of action, except allegations regarding ultra vires, and false representations as to diplomas.

The sixth cause of action, which is labeled "(Fraudulent Representations Concerning Professional Services)," realleges the allegations of the first cause of action, except allegations regarding ultra vires, and selling and misuse of degrees.

The merger agreement is attached to the complaint and marked exhibit "Cl."[2]

---

[2]The merger agreement (omitting the schedules and signatures) is as follows:

"THIS AGREEMENT is made and entered into this —— day of May, 1961, by and between the CALIFORNIA MEDICAL ASSOCIATION, an unincorporated association, hereinafter sometimes called the 'CMA' and the CALIFORNIA OSTEOPATHIC ASSOCIATION, a California corporation, hereinafter sometimes called the 'COA,' to be effective at the time, and upon the terms and conditions as hereinafter set forth below.

"A. GENERAL.

1. *Purposes.* This agreement is made and entered into for the primary purposes of improving the health services available to the citizens of the State of California, and expanding medical teaching facilities in the State. The 'Governor's Committee on the Study of Medical Aid and Health' has urged immediate expansion of 'medical educational capacity in private and public institutions' and the establishment of new medical schools. These purposes are to be further accomplished by the unification, consonant with the desires of individual practicing physicians within the State of California, of the separate organizations which have heretofore existed in parallel structure in the State of California for the practice of medicine and surgery by persons

The declaratory judgment as to the first cause of action provides in part: The merger agreement is legal and valid

who hold the degree of Doctor of Osteopathy and those who hold the degree of Doctor of Medicine. By accomplishing such unification, the parties hereto intend to remove any *distinction among the individuals* practicing medicine and surgery that is not related to skill and ability, to make available to the public at large efficient and adequate hospital facilities, and to improve the educational facilities available for those persons engaged in the practice of medicine and surgery. It is also a primary purpose of the parties hereto that upon the students at the present College of Osteopathic Physicians and Surgeons in Los Angeles or its successor becoming eligible to be licensed by the State Board of Medical Examiners, no new or additional physician and surgeon's certificates shall thereafter be issued by the State Board of Osteopathic Examiners, whether applied for under Articles 5, 6 or 11 of Chapter 5, Division 2, of the California Business and Professions Code. It is not the purpose of any party to this agreement to alter or diminish in any way the practice rights of individual physicians, or to limit their opportunity of future practice.

"2. *Execution and effective date.* Upon approval of this agreement by the governing boards of the respective parties hereto, this agreement shall be executed by the Chairman of such board and its Secretary. Said signatures shall indicate the approval of that board only.

"This agreement shall become binding and effective when it has been ratified by the House of Delegates of each of the parties hereto, in accordance with the appropriate rules and regulations of each respective organization.

"The parties hereto recognize and acknowledge that the consummation of this agreement will require certain amendments to be made to the constitution of the CMA, and that the constitution requires that a proposed amendment, after introduction, lay on the table for a period of one year prior to its final adoption and effectiveness. This agreement, however, shall become effective upon its initial ratification by both houses as above set forth, subject only to the conditions hereinafter set forth.

"3. *Reference to COA.* As hereinafter provided, the COA agrees to change its name, and may in the course of the transition period change its organic structure. References to COA shall thus include such organization, although its name shall be changed, and its organic structure may be changed.

"B. MATTERS RELATED TO THE STRUCTURE OF CALIFORNIA MEDICAL ASSOCIATION.

"1. *Amendments to Constitution and By-Laws.* The Council of the CMA shall propose to its House of Delegates two amendments to the constitution, and one amendment to the by-laws of the CMA, as set forth on Exhibits A, B, and C, respectively, attached hereto and made a part hereof by reference.

"The House of Delegates of the CMA shall, as a condition precedent to the effectiveness of this contract, approve and adopt said amendments.

"2. *Issuance of new charter to component society.* Upon said amend-

as against all the contentions of plaintiffs. The agreement is not illegal or void by virtue of any of the allegations of plain-

ments becoming finally effective, the COA agrees (a) to change its name to the Forty-First Medical Society or such other name as may be jointly approved by the Board of Trustees of the COA and the Executive Secretary of CMA, and thereafter, (b) to apply for a charter as a component society of the CMA. The CMA agrees to issue such charter. The terms and conditions of the charter to be applied for, and to be issued, shall be as set forth on Schedule D attached hereto, and made a part hereof by reference.

"3. *Dissolution of COA.* The parties hereto acknowledge that the structure herein agreed upon for the issuance of a charter to a state-wide organization under such new name is intended only as an interim measure. It is the intention of both parties hereto that all persons who are members of such society shall become members of their respective county medical societies as soon as possible. However, such arrangement requires the consent of each of the respective county medical societies. When the county medical societies ''throughout the State of California agree to take into membership in the respective appropriate county medical society each of the members of such society, it shall be dis-solved. Upon such dissolution, all of the assets then remaining of such society shall, so far as is legally possible, be transferred and conveyed to the College of Osteopathic Physicians and Surgeons, or its successor.

''C. PRACTICE OF MEDICINE AND USE OF DEGREE.

''The parties hereto contemplate that individual members of the COA who hold physicians and surgeons certificates in the State of California will obtain a degree of Doctor of Medicine from the College of Osteo-pathic Physicians and Surgeons or its successor. The CMA agrees to accept such procedures which may be agreed upon by the Advisory Educational Committee, created by the joint action of the parties here-to, as to the manner in which said degrees shall be granted, provided, however, that the agreed procedures do not jeopardize accreditation of the College. Both parties hereto agree to recognize such degrees as an M.D. degree issued by an accredited medical school.

''D. STATUTORY AMENDMENTS.

''1. *Use of Degree.* Both parties hereto agree to use their best efforts to have adopted by the legislature of the State of California statutory amendments as set forth in Exhibit E attached hereto and made a part hereof by reference. The parties hereto contemplate that where persons hold a degree of Doctor of Medicine and a degree of Doctor of Osteop-athy, such person shall be required to elect to practice under one or the other of such degrees, and to advise both the Board of Medical Examiners and the Board of Osteopathic Examiners of such election.

''2 *Boards of Examiners.* Both parties agree to use their best efforts to have adopted by the California Legislature the statutory amendments relating to the structure of the Board of Medical Examiners of the State of California and regarding the reciprocity statutes affecting such board, as set forth on Schedule F, attached hereto and made a part hereof.

''3. *Initiative Act.* Both parties hereto agree to use their best efforts

tiffs. The facts alleged show no conspiracy among defendants or any of them, to prevent competition in or to control or monopolize the practice of medicine in California, or to restrain

to have adopted by the legislature and by the people of the State of California, the proposal set forth on Exhibit G attached hereto and made a part hereof, regarding the initiative act establishing the Board of Osteopathic Examiners.

"E. COLLEGE OF OSTEOPATHIC PHYSICIANS AND SURGEONS.

"1. *Agreement with College.* The COA agrees to negotiate a contract with the College of Osteopathic Physicians and Surgeons covering the matters hereinafter set forth. In the event that the COA is unable to enter into such an agreement, the CMA shall have its option to declare this contract entirely null and void. Said contract shall contain:

" (a) A procedure for the issuance of degree of Doctor of Medicine to doctors of Osteopathy presently licensed as physicians and surgeons in the State of California.

" (b) An agreement that said College shall use its best efforts to obtain approval by the Council on Medical Education and Hospitals and membership in the Association of American Medical Colleges.

" (c) The name of the College shall be changed, so that neither the word 'osteopathic' nor any similar word shall be used therein.

"2. *Agreements relating to College.*

" (a) The parties hereto shall jointly use their best efforts to secure appropriate administrative rules or statutory changes to permit students currently enrolled in the College of Osteopathic Physicians and Surgeons to be eligible for examination by the licensing board of their choice: and

" (b) The parties hereto shall agree with each other, and with the College of Osteopathic Physicians and Surgeons as follows:

" (i) The COA shall continue to contribute to the College fund for its operation at the rate of a minimum of $225,000.00 per year until one year from the time all conditions set forth in this agreement are met. Thereafter, for an additional four years, COA and its successor shall allocate to the College at least Fifty Dollars ($50.00) per regular member per year, payable from the annual dues it charges its members (not including therein dues it pays to the CMA and the American Medical Association).

" 'Regular member' shall not include persons granted reduced rate of dues for any reason. The CMA and the COA shall jointly guarantee to the College that it shall receive funds in at least said amount of $225,000.00 per year payable quarterly from the sources herein indicated for an additional period of four years thereafter. As between the CMA and the COA, the CMA will agree to supply said funds to said amount during said four year period to the extent that the COA or its successor does not do so. The funds to be supplied under this paragraph may come from said organization "directly, or may come from contributions from public or private sources, from funds or foundations, or otherwise, so long as they are arranged directly by the persons associated with and acting for the COA or the CMA.

" (ii) In the event that adequate arrangements for the financing of the College have not been concluded after said period, the COA and the

the trade or property rights of persons or institutions who oppose the merger agreement or who refuse to practice as doc-

CMA jointly declare their intention of seeing that the College has adequate operating funds to make up for the loss of funds which otherwise might have been paid by the COA had this agreement not been entered into. However, this expression of intention is made without binding obligation on the parties hereto at this time.

"(c) *Accreditation.* Both parties hereto shall use their best efforts to see that the College of Osteopathic Physicians and Surgeons, or its successor, is accredited as a medical school as soon as possible.

"F. PRACTICE RIGHTS.

"1. *General.* As hereinabove set forth, both parties hereto acknowledge and declare that this agreement is not intended in any way to limit the practice rights of individual physicians.

"2. *Hospitals.* The parties hereto shall join in a joint statement of policy with respect to practice rights and hospital privileges of physicians, to be forwarded to all hospitals in the State of California. A copy of such joint declaration is attached hereto marked 'Exhibit H' and made a part hereof by reference.

"3. *Specialty Rights.* The parties hereto shall issue a joint declaration with respect to the specialty privileges of individual physicians, a copy of which joint statement is attached hereto marked 'Exhibit I' and made a part hereof by reference. A copy of such declaration shall be forwarded to all hospitals, and to all physicians and surgeons in the State of California.

"4. *Removal of Distinctions.* Both parties hereto shall use their best efforts, on a continuing basis, to remove any distinction between or among persons holding a certificate as physician and surgeon in the State of California and a degree of Doctor of Medicine, where such distinction is based solely upon the ground that any such person previously held or now holds a degree of Doctor of Osteopathy.

"5. *Evaluation Groups.* The CMA agrees that the COA may continue for the purpose of serving its own members, such specialty and other evaluation groups as may have been established by it on or before April 1, 1961, and whose criteria shall be not less than those shown in a separate document entitled: 'Criteria of Evaluation Groups, California Osteopathic Association' heretofore delivered to the CMA by the COA. All records of such evaluation and specialty groups shall be made available to the Commission on Medical Education of the CMA for examination and review.

"G. TIME SCHEDULE AND CONDITIONS.

"1. *Conditions Precedent.* As hereinabove set forth, this agreement shall become effective upon ratification by the House of Delegates of both of the parties hereto. However, this agreement shall have no force or effect of any kind, unless the following conditions are met within the time periods hereinafter set forth.

"(a) *Final adoption of constitutional amendments.* The final adoption of the constitutional amendment set forth on Exhibits A and B attached hereto shall take place on or before May 15, 1962.

"(b) *Approval of College of Osteopathic Physicians and Surgeons.*

tors of medicine. The acts of defendants as alleged are legal and valid. The agreement does not restrain trade or create or tend to create a monopoly under the Cartwright Antitrust Law, nor is the same unlawful under the common law as a restraint of trade. The agreement does not provide for restraints against doctors of osteopathy who refuse to become doctors of medicine or who oppose the merger. The agreement

The College of Osteopathic Physicians and Surgeons or its successor shall be approved by the State Board of Medical Examiners on or before May 15, 1962.

"(c) *Hospitals.* On or before May 15, 1962, assurance from the Joint Commission on Accreditation as follows:

"(i) That hospitals presently approved by the COA Committee on Hospitals will be evaluated by them upon application.

"(ii) That Doctors of Osteopathy who have received a degree of Doctor of Medicine from the College of Osteopathic Physicians and Surgeons, or its successor under the procedure to be determined upon, will be recognized as persons holding degrees of Doctor of Medicine from an approved medical school for all purposes connected with the approval of hospitals.

"In the event that any of said conditions have not been met by the time herein set forth, the COA shall have the option of waiving such condition and continuing this agreement in effect, or of terminating this agreement and declaring it to be entirely void and of no effect.

"When all of such conditions have been either met, or waived by the COA, whether before or at the time limit set forth herein, each party shall immediately undertake performance of all things to be performed by it herein.

"5. *Time table.* The parties shall immediately begin their efforts to have those legislative amendments set forth on Schedule E adopted and approved.

"The parties shall attempt to have those legislative and initiative measures approved as set forth on Schedules F and G as soon as all of the conditions precedent in this agreement have been met. The parties contemplate that such conditions shall all be met on or before May 15, 1962.

"H. MISCELLANEOUS.

"1. *Phraseology.* The phraseology included herein in connection with the proposed amendments to the constitution and by-laws of the CMA, proposed statutory enactments and initiative enactment, is used for the purpose of setting forth the general intention of the parties hereto, and a change in the terminology used shall not be deemed to alter the effect or interfere with the performance of this agreement in any way, so long as it accomplishes the underlying intention of the respective provisions involved.

"2. *Further documents and acts.* Each party hereto agrees to execute such other documents and agreements, and to undertake such other steps as may be necessary, in good faith, to carry out the underlying purpose of this agreement.

"IN WITNESS WHEREOF, the parties hereto have executed this agree-

is not ultra vires as to COA. It does not provide for or constitute the unlawful purchase, barter, or sale of medical degrees. It does not provide for or intend any unlawful use of the suffix M.D., and particularly is not in violation of sections 2396 and 2430 of the Business and Professions Code. It does not provide for or intend the making of misleading statements to the public concerning professional services. The provisions of the agreement relating to COPS, and particularly those regarding the accreditation of the college as a medical school are legal and valid.

In this proceeding which came before the court on demurrer, it was proper under the circumstances here for the court (after waiver of notice by plaintiffs) to make a declaration of rights under the first cause of action for declaratory relief. (See *Essick* v. *City of Los Angeles*, 34 Cal.2d 614, 624 [213 P.2d 492]; *Wilson* v. *Board of Retirement*, 156 Cal.App. 2d 195, 199-200 [319 P.2d 426].)

Appellants contend that the allegations of the complaint show that defendants entered into a conspiracy to restrain trade and competitive practice of medicine by eliminating the practice of medicine by plaintiffs and others as identified osteopathic physicians and surgeons. They argue that defendants conspired and agreed: to eliminate the osteopathic

---

ment the day and year first written above, and ratify it as hereinafter set forth.

"THE AGREEMENT IS HEREBY APPROVED by the respective governing boards, subject to ratification as hereinabove set forth.

"BOARD OF TRUSTEES
CALIFORNIA OSTEOPATHIC
ASSOCIATION

CALIFORNIA MEDICAL ASSOCIATION
COUNCIL

By .........................By .........................
       President                   Its Chairman

By .........................By .........................
       Secretary                   Secretary

The within agreement has been ratified by the respective Houses of Delegates, on the dates indicated below:

CALIFORNIA OSTEOPATHIC
ASSOCIATION

CALIFORNIA MEDICAL
ASSOCIATION

Date: ...............         Date: ...............

By .........................By .........................
       President                  President

By .........................By .........................
       Secretary                   Secretary       "

profession and the medical theory represented thereby; to prevent competition in, and to control and monopolize the practice of medicine by combining their capital and power; to eliminate as an osteopathic college the only osteopathic college in California, by converting it into an allopathic college; to cause the college to barter and sell medical degrees; and to accomplish such things by employing funds and property of the California Osteopathic Association in manners which violate its charter. They argue further that the issues involve not only freedom of competition as to economic activities but also involve freedom of competition regarding ideas as between two opposed schools of thought. Appellants allege in the complaint that the merger agreement is unlawful and void under the Cartwright Act (antitrust law—Bus. & Prof. Code, §§ 16700 et seq.). ■ The "Cartwright Act is not applicable to restraints on the practice of medicine." (*Willis* v. *Santa Ana etc. Hospital Assn.*, 58 Cal.2d 806, 810 [26 Cal.Rptr. 640, 376 P.2d 568].) In the *Willis* case, however, it was said: "There is an established principle at common law that an action will lie where the right to pursue a lawful business, calling, trade, or occupation is intentionally interfered with either by unlawful means or by means otherwise lawful when there is a lack of sufficient justification. . . . Whether there is justification is determined not by applying precise standards but by balancing, in the light of all the circumstances, the respective importance to society and the parties of protecting the activities interfered with on the one hand and permitting the interference on the other." Appellants state that they did not base the antitrust aspect of the conspiracy charge on the Cartwright Act alone, but also based it on common law antitrust principles. ■ As stated in the *Willis* case, an element of such an action at common law is intentional interference with the right to pursue a business or calling. ■ The merger agreement, which is a part of the complaint, states that it is not the purpose of the parties to alter or diminish in any way the practice rights of individual physicians, or to limit their opportunity of future practice. The complaint does not allege interference with the practice of any plaintiff. Under the agreement and the law, a doctor of osteopathy may continue his practice and use the designation "D.O."—he is not required to give up his designation of "D.O." nor the practice of osteopathy. The complaint does not allege a cause of

action under such common law principle regarding interference with a trade or calling.

As shown by the complaint, the doctors of osteopathy receive training and education equal in all respects to allopathic medicine. Under the law (Medical Practice Act), licensed osteopaths and allopaths have the same authority in the practice of their professions—they are authorized, by virtue of their licenses, to administer drugs, perform surgery, and to use all other methods of treatment of diseases and injuries of human beings. Although each profession has the same authority, the Medical Practice Act is administered by two boards, the Board of Osteopathic Examiners, and the Board of Medical Examiners. The merger agreement states that the ''[A]greement is made . . . for the primary purposes of improving the health services available . . . and expanding medical teaching facilities. . . . These purposes are to be further accomplished by the unification, consonant with the desires of individual practicing physicians within . . . California, of the separate organizations which have heretofore existed in parallel structure . . . for the practice of medicine and surgery by persons who hold the degree of Doctor of Osteopathy and those who hold the degree of Doctor of Medicine. By accomplishing such unification, the parties hereto intend to remove any distinction among the individuals practicing medicine and surgery that is not related to skill and ability, to make available to the public . . . adequate hospital facilities, and to improve the educational facilities. . . .'' The merger agreement also provided that the parties would use their best efforts to have certain statutory amendments adopted by the Legislature, such proposed amendments as those set forth in schedules attached to the agreement. One such amendment was to the effect that under certain circumstances a licensed osteopath would be authorized to use the designation ''M.D.,'' provided he elected not to use the designation ''D.O.'' Another proposed amendment was to the effect that the Board of Osteopathic Examiners shall enforce the statutory provisions relating to licensed osteopaths, except that such board shall have no authority over osteopaths who elect to use the designation ''M.D.'' The merger agreement provided further that the parties would use their best efforts to have a certain proposal adopted by the Legislature and by the People, regarding the 1922 Initiative Act which established the Board of Osteopathic Examiners. That pro-

posal was to the effect that said Initiative Act may be amended by the Legislature; and that when the number of persons who are subject to the jurisdiction of the Board of Osteopathic Examiners reaches 10 or less (later this was changed to 40 or less), the Legislature may repeal the act and transfer all the functions of said board to the Board of Medical Examiners.

An agreement to sponsor legislation does not violate anti-trust laws. (See *Eastern Railroads Presidents Conference* v. *Noerr Motor Freight, Inc.,* 365 U.S. 127 [81 S.Ct. 523, 5 L.Ed. 2d 464].)

The proposed amendments above referred to, and other amendments, were adopted by the Legislature. The proposal with reference to the 1922 Osteopathic Initiative Act, known as Proposition 22, was approved by the People at the election in November 1962. It may be stated generally that the matters covered by legislation are: the authorization to use the "M.D." designation, and the prohibition against using the "D.O." designation if an osteopath elects to use the "M.D."; the prohibition on licensing osteopaths (from other states) by reciprocity (Bus. & Prof. Code, §§ 2310 and 2492) or by the Board of Osteopathic Examiners (Proposition 22 — by the People); and the eventual dissolution of the Board of Osteopathic Examiners, under certain conditions, by the Legislature (Proposition 22). It thus appears that the public policy of the state has been declared or established in favor of the principal matters involved in the merger or unification agreement. The People, in approving Proposition 22, authorized the Legislature to terminate the separate administrations of the Medical Practice Act, by discontinuing the Board of Osteopathic Examiners under certain conditions above indicated. In other words, it appears that the principal matters involved in the merger agreement have been accomplished by legislation. ▆▆ The Legislature has authority to regulate the practice of medicine. (See *Gamble* v. *Board of Osteopathic Examiners,* 21 Cal.2d 215, 219 [120 P.2d 382].) ▆▆ It appears that the California Osteopathic Association decided that the best interests of the association would be served through unification. (According to statements in respondents' brief, 2,000 persons [licensed as osteopaths] transferred, under provisions of the new legislation, from the Board of Osteopathic Examiners to the Board of Medical Examiners; approximately 453 such persons are still subject to the jurisdiction of the Board of Osteopathic Examiners;

some of the 453 persons do not reside in California; 94 of the remaining persons have limited licenses [such as drugless practitioners] and are not eligible to obtain M.D. degrees; the other 220 persons are practicing osteopathy in California and presumably object to the unification.) The allegations of the complaint do not show that defendants entered into a conspiracy to restrain trade or competitive practice of medicine.

Appellants contend further that the defendants in contracting for the issuance of M.D. degrees by the College of Osteopathic Physicians and Surgeons violated statutory provisions prohibiting barter or sale of medical degrees. The merger agreement provided that the parties contemplate that osteopaths will obtain M.D. degrees from the college; and that the California Medical Association agrees to accept such procedures regarding this as may be agreed upon by a certain committee; that the college would convert to an allopathic college, would be accredited as such, and would issue M.D. degrees to licensed California osteopaths without any examination and without attending the college. Another provision of the merger agreement is that CMA guarantees that the college will receive the annual contribution of $225,000 to be made by COA for four years. The merger agreement stated in effect that COA would continue to pay to the college a minimum of $225,000 a year for four years; that CMA and COA jointly guarantee that the college will receive that amount. The complaint alleged in effect that the annual income of the college was $750,000, and that a minimum of $200,000 a year additional had been required for expenses and that that amount had been supplied by donations. Appellants assert that the guaranty by CMA was in effect illegal barter and sale of degrees. The merger agreement does not bear an interpretation that the agreement of the college to set up a procedure regarding the degrees was made the consideration for the guaranty. The provisions of the merger agreement relating to the college were an integral part of the agreement between COA and CMA. COA had given more than $200,000 a year to the college for five years before the complaint was filed. The persons who were to be considered as ones to receive degrees were osteopaths who already had been licensed by the state, and their licenses authorized them to render the same medical services as allopaths, and the educational requirements were the same as to both profes-

sions. ██ The Legislature in amending section 2396 of the Business and Profession Code gave implied approval of the issuance of such degrees. That amendment was to the effect that the use of an M.D. degree by a person licensed as a physician and surgeon was not unprofessional conduct where his degree was issued by a medical school in California at any time prior to September 30, 1962, and approved by the Board of Osteopathic Examiners or the Board of Medical Examiners. ██ In view of all the circumstances, including those just mentioned, it cannot be said that the issuing of the degrees violated any statute.

██ Appellants contend further that the issuance of M.D. degrees under section 2396 of the Business and Professions Code, as amended, was illegal for the reason the section is unconstitutional. Their argument is to the effect that it was special legislation applicable to certain persons (osteopaths) who have not completed a full course of study required by an approved medical school, whereas other persons are required to complete such a course.

At the time the agreement was made said section 2396 provided: ''Unless the holder of any certificate provided for in this chapter ... has been granted the degree of doctor of medicine after the completion of a full course of study as prescribed by an approved medical school . . . the use of the term or suffix 'M.D.' constitutes unprofessional conduct within the meaning of this chapter.'' In 1961 the section was amended by adding thereto: ''However, any person holding a physician's and surgeon's certificate under the jurisdiction of the Board of Osteopathic Examiners of the State of California and a degree of Doctor of Medicine issued by a medical school located in the State of California at any time prior to September 30, 1962, and approved either by the Board of Osteopathic Examiners of the State of California or the Board of Medical Examiners of the State of California at the time of the issuance of such degree, shall be authorized to use the term or suffix 'M.D.,' and such use shall not be unprofessional conduct, so long as such person, on or before October 31, 1962, advises both the Board of Medical Examiners and the Board of Osteopathic Examiners, in writing, that he has elected to use the term or suffix 'M.D.,' and has elected not to use the term or suffix 'D.O.' In the event of such election, the use of the term or suffix 'D.O.' constitutes unprofessional conduct within the meaning of this chapter.'' (In

1962 the section was further amended by substituting the date, December 31, 1962, in place of October 31, 1962.) The class of persons referred to in that legislation is the class or group holding certificates as physicians and surgeons and holding an M.D. degree from a school which has been approved. This is not an unreasonable classification. Appellants argue further that this section is invalid because it grants to the college (COPS) a special privilege with respect to the issuance of M.D. degrees. The section provides that it is applicable to an approved "medical school located in the State of California." The college was not granted a special privilege. The section as amended is not unconstitutional or invalid.

Appellant also contends that the acts of COA with respect to the merger agreement constituted acts ultra vires the articles of incorporation, particularly the provision therein that COA was incorporated for the following stated purpose: "To maintain a standard of education and to promote the welfare and influence of the profession of osteopathy." The complaint alleges that COA amended its articles about May 1961, purporting to provide: "The aforesaid purpose includes the unification of all those medical practitioners licensed by . . . California as physicians and surgeons in one medical association. . . ." It seems that the argument assumes that osteopathy must be maintained as a profession separate and distinct from allopathy. As above stated, COA was incorporated in 1900, when the two professions were very different. In 1901 an osteopath was not authorized to prescribe drugs or to perform surgery. As shown by the complaint, and according to law, both professions now have, and for many years have had, the same authority — to use all methods of treatment. It appears that COA decided that its interests and the interests of the public would be more efficiently served by unification. Section 803, subdivision (b), of the Corporations Code provides: "No limitation upon the . . . powers of the corporation ... contained in ... the articles ... shall be asserted as between the corporation or any shareholder and any third person." Subdivision (c) of that section provides: "Any contract ... made in the name of a corporation which is authorized or ratified by the directors ... binds the corporation. . . ." The complaint shows that the board of trustees of COA ratified the agreement. The contention regarding alleged ultra vires acts is not sustainable.

In view of the above conclusions, it is not necessary to discuss other contentions on appeal.

Respondents have made a motion to dismiss the appeal as to the judgment on the fourth and fifth causes of action (*re* alleged sale of degrees, and alleged misuse of "M.D." designation). The motion is upon the ground that 12 of the 18 plaintiffs have indicated by their conduct that they no longer support the position taken in the complaint. It is asserted that 15 of the plaintiffs have received M.D. degrees and 12 are now practicing under that designation; that only 6 plaintiffs are in a position to proceed to attack the issuance of the degrees, but they lack standing to do so because a minimum of 10 is required. The motion to dismiss is also made on the ground that the said 12 plaintiffs have received the benefit of the judgment from which they are appealing. The two causes of action are based on section 2436 of the Business and Professions Code. That section provides, in part, that "... the superior court ... on application of the board or of 10 or more persons holding physician's and surgeon's ... certificates ... may issue an injunction. ..."

Appellants state in effect, in opposition to the motion, that the acts of the plaintiffs who applied for and received the degrees were coerced and not voluntary — for the reason that under section 2396 of the Business and Professions Code they were required to elect, before December 31, 1962, whether they would apply for the degree. They assert that since they were faced with the "time-coercion" of such requirement by law, and in order to preserve their freedom to practice as doctors of medicine if the challenged program should ultimately be held proper, they applied for and obtained the degrees. Appellants also assert that the remaining plaintiffs have the right to maintain the action; and that in any event that the organizational plaintiff (OPSC) has the right to prosecute the action. The motion to dismiss is denied.

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied February 24, 1963, and appellants' petition for a hearing by the Supreme Court was denied March 25, 1964.