[Civ. No. 12304. Third Dist. Apr. 17, 1970.]

THEODORE A. D'AMICO et al., Plaintiffs and Appellants, v.
BOARD OF MEDICAL EXAMINERS et al.,
Defendants and Respondents.

## COUNSEL

Alexander R. Tobin and Lawrence M. Gassner for Plaintiffs and Appellants.

William F. Steigman as Amicus Curiae on behalf of Plaintiffs and Appellants.

Thomas C. Lynch, Attorney General, John Robert Burton, Assistant Attorney General, and Raymond M. Momboisse, Deputy Attorney General, and Morgan & Brown for Defendants and Respondents.

## OPINION

**BRAY, J.**[*]—Eight petitioners, graduates of various colleges of osteopathy,[1] filed a petition for writ of mandate directing defendant licensing boards to supply them with forms on which to take examinations for licenses to practice medicine and surgery in this state. Certain of the petitioners later filed an amended petition to be granted reciprocal medicine and surgery licenses or to be supplied reciprocal examination forms.

Defendants appeared by demurrers. The demurrer of the Board of Osteopathic Examiners (hereinafter Osteopathic Board) was sustained without leave to amend. The demurrer of the Board of Medical Examiners (hereinafter Medical Board) was sustained without leave to amend as to certain causes of action and overruled as to others. Judgment was entered accordingly. It ordered a peremptory writ of mandate to issue against Medical Board commanding it to furnish application forms to each petitioner and to process the applications in accordance with the provisions of the California Medical Practice Act and upheld the constitutionality of section 2310 of the Business and Professions Code (denying osteopaths reciprocity).

### QUESTIONS PRESENTED

Primarily the issue is as to whether the initiative act of 1962 prohibits graduates of schools of osteopathy from the practice of medicine. If it does, is the act constitutional? Secondly, is section 2310 of the Business and Professions Code, denying reciprocity to osteopathic school graduates, constitutional?

---

[*]Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1]The American Osteopathic Association has filed herein an amicus curiae brief on behalf of petitioners.

## HISTORY

To determine the effect of the Osteopathic Act of 1962 it is necessary to consider the history of the licensing of osteopathic graduates to practice medicine in California.

Osteopathy began as a system of healing based on the theory that all diseases were caused by irregularities in the musculoskeletal structure, and that they could be corrected primarily by manipulation without the use of drugs. This original theory has become less important to the practice of osteopathy. Colleges of osteopathy now have curricula more or less identical with those of medical schools, except that the former still teach the technique of manipulative therapy. The American Medical Association now allows its individual state associations to determine their own relationship with local osteopaths. In 1962 the California Medical Association and the California Osteopathic Association merged and sponsored the legislation which causes the problem in this case. (See description of merger in *Osteopathic Physicians & Surgeons* v. *California Medical Assn.* (1964) 224 Cal.App.2d 378 [36 Cal.Rptr. 641].)

"Between 1913 and 1922 all physicians and surgeons were licensed by the Board of Medical Examiners. Graduates of all schools recognized by the medical board, whether osteopathic, homeopathic, eclectic or allopathic, were entitled to take the physician and surgeon's examination if they met the prescribed conditions." (*Gamble* v. *Board of Osteopathic Examiners* (1942) 21 Cal.2d 215, 216-217 [130 P.2d 382].)

The present Medical Practice Act is substantially the same as the 1913 act (as recodified in 1937) described in *Gamble*. But from 1922 to 1962 the Medical Board did not have the authority to examine and license osteopathic graduates because of an initiative measure, the Osteopathic Act of 1922. (Stats. 1923, p. xciv, § 2.) "The Osteopathic Act created a Board of Osteopathic Examiners and gave it jurisdiction, formerly residing in the Board of Medical Examiners, over graduates of osteopathic schools. The act was intended to effect administrative changes oniy, and made no substantive changes in the standards of education and examination for the physician and surgeon certificate. When the Osteopathic Act was adopted the rights and duties attached to the physician and surgeon certificate did not vary according to the kind of school from which the holder graduated." (*Gamble* v. *Board of Osteopathic Examiners, supra,* 21 Cal.2d at p. 217.)

Osteopaths were first licensed in California pursuant to Statutes of 1901, chapter XCIX, page 113. (*In re Rust* (1919) 181 Cal. 73, 77 [183 P. 548].) The statute provided for a State Board of Osteopathic Examiners, appointed by the Osteopathic Association. Licensees of this board could not

prescribe drugs nor practice major surgery, thus adhering to Still's tenet that drugs were poisons. The practice of osteopathy was "declared not to be the practice of medicine or surgery" within the meaning of the original Medical Practice Act of 1876. The act of 1901 "was [impliedly] repealed by the general Medical Practice Act of 1907." (*In re Rust, supra,* at p. 74.) The latter act (Stats. 1907, ch. 212, p. 252) established a Board of Medical Examiners composed of nominees of the various allopathic, eclectic, homeopathic and osteopathic schools of medicine, which could license the practice of medicine and surgery, osteopathy, and "any other system or mode of treating the sick." Under the 1907 act osteopathy was obviously not the same as medicine and surgery. (*In re Rust, supra,* at p. 74.) It has been said, however, that some osteopaths were licenesd under the act of 1907 to practice medicine and surgery. (Cal. Assembly Interim Committee on Governmental Efficiency and Economy, Restoration of Osteopathic Licensure (Dec. 2, 1966, transcript of hearing, at p. 5).)

The act of 1907 was, in turn, expressly repealed by the Medical Practice Act of 1913. (Stats. 1913, ch. 354, § 23, p. 737.) The 1913 act is important because it is the source of much of the current code. (Stats. 1937, ch. 414, p. 1254.) It created a new board to be "appointed from among persons who hold licenses under any of the medical practice acts of this state," i.e., osteopaths could but were not required to be members. (Stats. 1913, ch. 354, § 1, p. 723.) The board was authorized to issue two forms of certificate: (1) a " 'physician and surgeon certificate,' " and (2) a " 'drugless practioner certificate.' " (P. 725.)

Beginning in 1913 the Medical Board granted at least 288 physicians and surgeons licenses to osteopaths. However, the osteopathic profession began to be harassed by the Medical Board and finally in 1919 the board arbitrarily refused to examine any more osteopaths and withdrew its approval of the osteopathic college in this state. The college went to court in *College of Osteopathic Physicians & Surgeons* v. *Board of Medical Examiners* (1921) 53 Cal.App. 138, 139 [199 P. 1093]. The court held that the college was entitled to the approval of the board and its graduates to examination and admission to the practice of medicine and surgery. Nevertheless, the tensions between the osteopaths and the allopaths continued and the initiative Osteopathic Act of 1922 was adopted.

It is an understatement to say that during the period from 1922 to 1962, the period when the Osteopathic Board granted phsyician and surgeon licenses to osteopaths, the Medical Board and the M.D.'s looked with less than great favor on the granting of licenses to osteopaths and continued the harassment of the latter and heartily favored the elimination of osteopaths altogether. The tension between the two groups led to the signing of an agreement in May 1961 between the California Medical Association and

the California Osteopathic Association. As stated in *Osteopathic Physicians & Surgeons* v. *California Medical Assn., supra,* 224 Cal.App.2d at page 397, this agreement was intended to unify "the separate organizations which have heretofore existed in parallel structure . . . for the practice of medicine and surgery by persons who hold the degree of Doctor of Osteopathy and those who hold the degree of Doctor of Medicine." The parties were to use their best efforts to get the Legislature to provide that under ceratin circumstances a licensed osteopath, if he so desired, could be authorized to use the designation "M.D." The Osteopathic Board was to retain jurisdiction over licensed osteopaths, but if a "D.O." became an "M.D." the jurisdiction over him would be in the Medical Board. When the number of D.O.'s reached 40 or less, the Legislature might repeal the Osteopathic Act of 1922 and transfer all of the functions of the Osteopathic Board to the Medical Board.[2] The only Osteopathic College in California was to be converted to an allopathic school issuing "M.D." degrees. No new or additional physician and surgeon licenses were to be issued by the Osteopathic Board. The parties to the agreement were to support what became the initiative Osteopathic Act of 1962.

### DID THE 1962 OSTEOPATHIC ACT ELIMINATE OSTEOPATHS?

It would appear from the agreement that it contemplated that the proposed initiative act would eliminate the licensing of osteopaths other than those in existence at the time of the agreement. The question is whether the 1962 Osteopathic Act accomplished that purpose.

It states that it is to amend the Osteopathic Act of 1922. It repeals section 2 of that act which granted to the Osteopathic Board the power to examine and license graduates of osteopathic schools for the practice of medicine and surgery. It then provides, in effect, that the Osteopathic Board shall have jurisdiction to enforce certain portions of the Medical Practice Act as to D.O.'s then holding physician and surgeon licenses, but as to any such who elect to practice using the suffix "M.D." the sole jurisdiction over them shall be in the Medical Board. The Legislature shall have power in the event the number of persons subject to the jurisdiction of the Osteopathic Board becomes 40 or less to repeal the act in its entirety and transfer all its functions to the Medical Board.

The act makes no mention of the matter of examining and licensing osteopaths after its effective date, nor does it make mention of what body, if any, shall succeed to the powers of the Osteopathic Board in examining

---

[2]Although the agreement says nothing about the elimination of new osteopaths from the practice of medicine and surgery, it must be noted that the parties contemplated that the number of licensed D.O.'s then existing would in time be reduced to 40 or less, a contingency which could not arise if new D.O.'s were to be licensed.

and licensing osteopaths, nor whether there are to be any more licensed osteopaths thereafter. ■ From the fact that a provision is made concerning jurisdiction over existing licensed osteopaths when their number is reduced to 40, a reasonable inference must be drawn that the act contemplates that there shall be no new osteopaths. Both the Attorney General and the Medical Board so interpreted the article until after this action was brought. ■ The Attorney General over a period of six years, as late as a week before this suit was filed, advised that under the law the Medical Board could not license osteopathic practitioners. ■ The contemporaneous interpretation of the Constitution by the Attorney General, while not of controlling significance, is entitled to great weight. (*Carter* v. *Commission on Qualifications, of Judicial Appointments* (1939) 14 Cal.2d 179, 185 [93 Cal.Rptr. 140]; *People* v. *Union Oil Co.* (1968) 268 Cal.App.2d 566, 571 [74 Cal.Rptr. 78].) No new osteopathic practitioners have been examined or licensed since 1962. ■ The Medical Board refused to supply petitions on demand with application forms and stated that there was no provision under California law for licensing osteopaths.

Even as late as May 23, 1969, (this action was filed March 15, 1968), the Medical Board continued to take the position that it was without authority to grant licenses to graduates of osteopathic schools. ■ Interpretation of statutes by the agencies which must administer and enforce them is entitled to great weight in the courts. (*Coca-Cola Co.* v. *State Board of Equalization* (1945) 25 Cal.2d 918, 921 [156 P.2d 1]; *Michels* v. *Watson* (1964) 229 Cal.App.2d 404, 409 [40 Cal.Rptr. 464].)

It is true that since the filing of this action both the Attorney General and the Medical Board have changed their position in regard to the effect of the 1962 Osteopathic Act. Nevertheless, their long continued contrary opinion is still entitled to consideration by us in determining the effect of the act; nor should their less than enthusiastic change of opinion, practically forced by the bringing of this action, upset the value of their original six-year interpretation. (See *United States* v. *Bergh*, 352 U.S. 40 [1 L.Ed.2d 102, 77 S.Ct. 106]; *United States* v. *Jackson*, 280 U.S. 183 [74 L.Ed. 361, 50 S.Ct. 143].)

The trial court apparently was not greatly convinced of the Medical Board's conversion for it stated ". . . the Board's ground is equivocal. However, in the context of its conduct, it appears that the Board's position was not merely that it had not, but also that it could not, approve the osteopathic colleges." The Medical Board has not approved any osteopathic college.

Certain acts of the Legislature indicate that it, too, has interpreted the act as prohibiting new osteopaths from licensure. Section 2310 of the

Business and Professions Code, to become operative in the event of the passage of the 1962 Osteopathic Act, provides reciprocity for persons authorized to practice medicine and surgery in another state provided he is a graduate of an approved medical school but denies it to a graduate of any other school. This would include osteopathic school graduates.

In 8 California Assembly Interim Committee Report on Governmental Efficiency and Economy, No. 10 (1965-1967), Licensing of Osteopathic Physicians and Surgeons, page 28, it is stated that the act repealed provisions of licensure of osteopaths and that California is now the only state in the union which makes no provision of any kind for the licensure of new and future professionals who have chosen to be osteopaths.

Section 2396.5 of the Business and Professions Code, adopted in 1963, provides that only osteopathic students who were residents of California on January 1, 1963, and were then in their last year of study at an approved osteopathic school could qualify to be examined by the Medical Board. Of some significance are the matters in the 1922 Osteopathic Act eliminated by the 1962 act without any provision being made for their continuance. Thus the eliminated section 2 of the 1922 act provided that graduates of osteopathic schools should make application to the Osteopathic Board for licenses provided for in the Medical Practice Act, but nothing is stated as to whether osteopathic graduates could still apply for such licenses or to whom application should be made.

In 1962 the Legislature in section 2100.5 of the Business and Professions Code provided that for the period January 15, 1963, to January 15, 1971, in addition to the 11 regular members of the Medical Board, there should be one D.O. who, prior to September 30, 1962, elected to use the term "M.D." instead of "D.O." Although, perhaps after January 15, 1971, a D.O. might be eligible for appointment to the Medical Board, a reasonable interpretation of this section with others adopted by the Legislature is that it contemplated that new D.O.'s had been eliminated in California.

In the argument against Proposition No. 22 (the initiative amendment of 1962 to the Osteopathic Act of 1922) sent to the voters Senator Virgil O'Sullivan stated that the result of the merger agreement and the adoption of the initiative "will eventually discontinue the practice of osteopathy in California." There is nothing in the argument in favor of Proposition No. 22 which refutes this statement.

The trial court took the position that even though it appears that the

intention of the proponents of the 1962 Osteopathic Act probably was to eliminate osteopathy in California, nothing was done to implement such intent, and that by eliminating from the act of 1922 the section giving the Osteopathic Board jurisdiction to grant licensure, the act has revived that portion of the Medical Act which formerly gave the Medical Board the right to license D.O.'s.

Government Code section 9607 provides "No statute or *part of a statute,* repealed by another statute, is revived by the repeal of the repealing statute without express words reviving such repealed statute or *part of a statute.*" (Italics added.) ■ Were it not for the manifest intention of the 1962 act to eliminate future osteopaths altogether (in time there are to be 40 or less of the present osteopaths), it might be concluded that jurisdiction under the 1913 act in the Medical Board to license osteopaths was revived. The antirevival statute relates only to absolute repeals. It is inapplicable here because the Medical Practice Act was left in force. The 1922 initiative measure did not repeal the 1913 Medical Practice Act but only excepted graduates of schools of osteopathy from its coverage. When the 1922 exception was repealed in 1962, the basic Medical Practice Act remained to be applied. (See *County of Ventura* v. *Barry* (1927) 202 Cal. 550, 554-555 [262 P. 1081]; *Pierce* v. *Riley* (1937) 21 Cal.App.2d 513, 518 [70 P.2d 206].) The 1962 Osteopathic Act repealed *a part* of the act of 1922, which in turn had repealed a portion of the Medical Practices Act of 1913. ■ Moreover, as we have shown, it is clear that the purpose of the 1962 act is inconsistent with any intention to revive the licensure of D.O.'s by the Medical Board. In determining the constitutionality of the 1962 Osteopathic Act certain principles must be kept in mind. ■ Thus, " '[w]hen the validity of an act . . . is drawn in question, and even if a serious doubt of constitutionality is raised, . . . [the] Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.' " (*International Assn. of Machinists* v. *Street* (1961) 367 U.S. 740, 749 [6 L.Ed.2d 1141, 1150, 81 S.Ct. 1784].) The court should not espouse an interpretation which invites constitutional difficulties.

■ However, the terms of the act, its effect if given the interpretation now urged by defendants, the administrative interpretations given it, the intent of the merger agreement in which it was agreed that the parties thereto would support the initiative or legislation bringing about the complete elimination of new osteopaths, and the interpretation of the act by the Legislature as shown by the statutes adopted in view of the passage of the act all compel the conclusion that the elimination of the licensure of new osteopaths is the only reasonable result.

## CONSTITUTIONALITY

The 1962 Osteopathic Act denying osteopaths the right to licensure brings us to the question of its constitutionality. This question was not passed upon by the trial court although it did determine that section 2310, denying reciprocal licenses to osteopaths, is constitutional.

As said in *Lelande* v. *Lowery* (1945) 26 Cal.2d 224, 232 [157 P.2d 639, 175 A.L.R. 1109], "A law is special within the prohibitions of the California Constitution (art. I, §§ 11, 21; art. IV, § 25) when it is not founded on a natural, intrinsic or constitutional distinction which reasonably justifies difference in treatment. . . . The Legislature can make reasonable classifications; i.e., classifications which have substantial relation to a legitimate object to be accomplished."

The test to determine the constitutionality of a statute or a provision of a constitution, particularly where the claim is that the enactment is unlawfully discriminatory, is whether any state of facts reasonably can be conceived that would sustain the enactment (see *Blumenthal* v. *Board of Medical Examiners* (1962) 57 Cal.2d 228, 232 [18 Cal.Rptr. 501, 368 P.2d 101]).

" ' "The courts must reach and determine the question whether the classifications drawn in a statute are reasonable in light of its purpose. . . ." . . .' " (*Otsuka* v. *Hite* (1966) 64 Cal.2d 596, 605 [51 Cal. Rptr. 284, 414 P.2d 412], quoting from *McLaughlin* v. *Florida,* 379 U.S. 184, 191 [13 L.Ed.2d 222, 227-228, 85 S.Ct. 283].)

"[W]here the determination whether a statute is unreasonable, arbitrary or not related to the ends proposed turns on factual considerations, the court may consider such facts and hear evidence with respect thereto." (16 C.J.S., § 97, p. 356.) Courts will not interfere except where constitutional rights are invaded. "But courts are not limited in their inquiry to those cases alone where such a situation is shown upon the reading of the statute. They will consider the circumstances in the light of existing conditions." (*In re Smith* (1904) 143 Cal. 368, 372 [77 P. 180].)

In determining the reasonableness of a classification under the police power, the court may look to general circumstances and conditions so far as they are matters of judicial knowledge and to other evidence. (See *Abbey Land etc. Co.* v. *County of San Mateo* (1914) 167 Cal. 434, 437 [139 P. 1068].)

Insofar as the question of the constitutionality of the 1962 Osteopathic Act is concerned, the question of whether there are facts which would justify a different classification of graduates from medical schools

from those from osteopathic schools is one which, under the pleadings in this case, should be decided in the first instance by the superior court, and that court not having determined that question, the case will have to be remanded for that determination. This question should not be determined on demurrer but by a trial.

As stated, the trial court considered the constitutionality of section 2310 of the Business and Professions Code (denying osteopathic reciprocity). No evidence was offered as to the reasonableness of classifying osteopath practicing physicians from M.D.'s (as the hearing was only on demurrer, oral evidence would not be admissible). The court did consider certain treatises which it claimed the right to consider as being subjects of judicial notice, which treatises the court stated were "in part provided by the Attorney General; in part the product of the court's own research." Petitioners contend that the court's action in considering these treatises without notice to them deprived them of the opportunity of questioning the sources and value of the materials and violated section 455 of the Evidence Code, which provides in pertinent part: "(a) If the trial court has been requested to take or has taken or proposes to take judicial notice of such matter, the court shall afford each party reasonable opportunity . . . to present to the court information relevant to (1) the propriety of taking judicial notice of the matter and (2) the tenor of the matter to be noticed.

"(b) If the trial court resorts to any source of information not received in open court, including the advice of persons learned in the subject matter, such information and its source shall be made a part of the record in the action and the court shall afford each party reasonable opportunity to meet such information before judicial notice of the matter may be taken."

As we hereinbefore stated, the matter of classification of the D.O.'s and M.D.'s is one that should not be decided on the limited showing which can be made on demurrer, but should be determined on a full scale hearing. For that reason the court's determination of the constitutionality of section 2310 must be reversed.

The order sustaining the demurrer of the Osteopathic Board is reversed, the order overruling the demurrer of the Medical Board is affirmed and the judgment in all other respects is reversed and the cause remanded to the superior court to allow defendants to answer the petition and the cause then be tried in accordance with the views herein expressed.

Pierce, P. J., and Regan, J., concurred.

The petition of the respondent Board of Medical Examiners for a hearing by the Supreme Court was denied June 17, 1970.