Dr. John MACELUCH, et al., Plaintiffs-Appellants,

v.

Dr. Charley E. WYSONG, President of the Composite State Board of Medical Examiners of Texas, et al., Defendants-Appellees.

No. 81–1364.

United States Court of Appeals, Fifth Circuit.

July 21, 1982.

---

Jack Hill, David L. Sherwood, Dallas, Tex., for plaintiffs-appellants.

Mark White, Atty. Gen., Bill Campbell, Asst. Atty. Gen., Austin, Tex., for defendants-appellees.

John G. Campbell, F. Dennis Nelson, Chicago, Ill., for amicus curiae Amer. Osteopathic Asso.

David M. Davis, Austin, Tex., for amicus curiae Texas Osteopathic Med. Ass'n.

Donald P. Wilcox, Texas Medical Ass'n, Austin, Tex., for amicus curiae Texas Medical Ass'n.

Before GOLDBERG, WILLIAMS and GARWOOD, Circuit Judges.

PER CURIAM:

The judgment is affirmed on the basis of the district court's opinion. A copy of Judge Higginbotham's opinion is attached as an appendix to this opinion.

AFFIRMED.

## APPENDIX

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

DR. JOHN MACELUCH and
DR. ROBERT GLICK,

       Plaintiffs,

V.

TEXAS STATE BOARD OF
MEDICAL EXAMINERS, et al.,

       Defendants.

CIVIL ACTION NO.
CA–3–77–1498–G

## ORDER

John Maceluch and Robert Glick are physicians licensed by the State of Texas who received degrees from a school that confers the degree "Doctor of Osteopathy" rather than the degree "Doctor of Medicine." They sue officers and various members of the Texas State Board of Medical Examiners ("Board"). Relying in part on the stipulated fact that "[t]here is no substantial difference between accredited medical schools irrespective of the terminology of the degree conferred, except that students attending medical schools conferring the degree 'Doctor of Osteopath' are required to take, and be examined in, several courses in manipulative therapy," plaintiffs ask this court to enjoin or declare unconstitutional the Texas licensing scheme which prevents them from using the designation "M.D." after their names on their letterhead and on other public listings of diverse nature. Plaintiffs allege that by forcing them to use the designation "D.O.," Texas subjects them to prejudice, antipathy and loss of earnings; that an "M.D." designation would more accurately identify their professional skills and practices. The parties have agreed to submit the case for decision on the basis of stipulations and the deposition testimony.[1]

In Texas, all licenses to practice medicine read the same, except that licensees with degrees from schools conferring the degree "Doctor of Medicine" have the initials "M.D." following their names and those with degrees from a school conferring the degree "Doctor of Osteopathy" have the initials "D.O." following their names. The requirements for licensure are identical: all Texas applicants must pass a uniform "Federation Licensing Examination" (FLEX).

Following established practice, the Board declined to issue plaintiffs licenses bearing the initials "M.D." because their diplomas read "Doctor of Osteopathy." Nevertheless, Maceluch and Glick utilize the initials "M.D." following their names in connection with their practice, in violation of Article 4590e.[2]

Plaintiffs offer three grounds for granting relief. First, they assert that certain licensing statutes and related practices violate the equal protection clause, both facially and as applied, when plaintiffs are compared to those with M.D. Licenses, or when comparing plaintiffs to graduates of foreign medical schools who obtain M.D. Licenses. Second, they assert that the actions of defendants violate the Texas constitution. Third, they assert that defendants' actions violate the First Amendment, especially in light of the allegedly generic nature of the designation, "M.D."

The Court does not find any of these arguments persuasive, and grants judgment in favor of defendants, as urged by all *amicus curiae*, including not only the Texas Medical Association, but also the Texas Osteopathic Medical Association, and the American Osteopathic Association.

## I.

The framework governing analysis of plaintiffs' equal protection claim was set

---

1. Richard Oliver was dismissed as not being a proper party plaintiff.

2. Section 3 of the Healing Art Identification Act. *Tex.Rev.Civ.Stat.Ann.* art. 4590e (Vernon) provides that:

    Sec. 3. Every person licensed to practice the healing art heretofore or hereafter by either the Texas State Board of Medical Examiners, the State Board of Dental Examiners, the Texas Board of Chiropractic Examiners, the Texas State Board of Examiners in Optometry, the State Board of Chiropody Examiners and the State Board of Naturopathic Examiners shall in the professional use of his name on any sign, pamphlet, stationery, letterhead, signature, or on any other such means of professional identification, written or printed, designate in the manner set forth in this Act the system of the healing art which he is by his license permitted to practice. The following are the legally required identifications, one of which must be used by practitioners of the healing art:

    (1) If licensed by the Texas State Board of Medical Examiners on the basis of the degree Doctor of Medicine: physician and/or surgeon, M.D.; doctor, M.D.; doctor of medicine, M.D.

    (2) If licensed by the Texas State Board of Medical Examiners on the basis of the degree Doctor of Osteopathy: physician and/or surgeon, D.O.; Osteopathic physician and/or surgeon; doctor, D.O.; doctor of osteopathy; osteopath, D.O.

forth in *New Orleans v. Dukes*, 427 U.S. 297 [96 S.Ct. 2513, 49 L.Ed.2d 511] (1976). There, the Supreme Court held:

> When local economic regulation is challenged solely as violating the Equal Protection Clause, this Court consistently defers to legislative determinations as to the desirability of particular statutory discriminations.... Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest. *Id.* at 303 [96 S.Ct. at 2516].

*See also Friedman v. Rogers*, 440 U.S. 1, 17 [99 S.Ct. 887, 898, 59 L.Ed.2d 100] (1979). When fundamental rights or suspect classifications are involved, however, stricter judicial scrutiny is called for. *Id.* *See also Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 70–71 [99 S.Ct. 383, 389–390, 58 L.Ed.2d 292] (1979); *Graham v. Richardson*, 403 U.S. 365, 373–75 [91 S.Ct. 1848, 1852–53, 29 L.Ed.2d 534] (1971).

The rational relationship standard applies here. To begin, controlling the designation under which physicians may practice is a form of economic regulation. *See, e.g. Vance v. Bradford [Bradley]*, 440 U.S. 93 [99 S.Ct. 939, 59 L.Ed.2d 171] (1978); *Williamson v. Lee Optical Co.*, 348 U.S. 483 [75 S.Ct. 461, 99 L.Ed. 563] (1955). Further, the "right" to be admitted to a profession, including medicine, is not fundamental *per se* in the constitutional sense. *See Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 313 [96 S.Ct. 2562, 2566, 49 L.Ed.2d 520] (1976); *San Antonio School District v. Rodriguez*, 411 U.S. 1, 16 [93 S.Ct. 1278, 1287, 36 L.Ed.2d 16] (1973); *Schware v. Board of Bar Examiners*, 358 [353] U.S. 232, 239 [77 S.Ct. 752, 756, 1

L.Ed.2d 796] (1957); *Younger v. Colorado Bd. of Bar [Law] Examiners*, 625 F.2d 372, 377 n.3 (10th Cir. 1980); *Lombardi v. Tauro*, 470 F.2d 798, 800 (1st Cir. 1972) *cert. denied*, 412 U.S. 919 [93 S.Ct. 2734, 37 L.Ed.2d 145] (1973); *D'Amico v. Board of Medical Examiners*, 11 Cal.3d 1, 113 [112] Cal.Rptr. 786, 798, 520 P.2d 10 [22] (Cal.1974). *A fortiori*, the "right" to use a particular professional designation is not fundamental. *See*, *Bib'le v. Comm. of Bar Examiners* [26 Cal.3d 548], 162 Cal.Rptr. 426, 430 [606 P.2d 733, 737] (Cal.1980).

Plaintiffs do not claim that the Constitution guarantees the right to use the "M.D." designation.[3] They argue instead that strict scrutiny should be applied when comparing plaintiffs with graduates from foreign medical schools. Plaintiffs allege foreign graduates, unlike D.O.'s, can obtain "M.D." designation despite the fact that they may not have received an M.D. degree initially. Plaintiffs contend this statutory classification is based solely on alienage, and therefore creates a 'suspect classification' ... [a] classification based on alienage is 'inherently suspect' and subject to close judicial scrutiny." Plaintiffs' Supplemental Argument and Authorities, at 4.

Assuming, arguendo, that D.O.'s who are citizens of the United States have standing to make this argument, and that a strict scrutiny standard applies, the argument nevertheless fails because the classifications are, beyond question, not based on alienage, but are based upon the locality of the education received. Substantial numbers of Americans attend medical schools abroad, just as some foreigners attend medical schools in the United States. There is no evidence in the record suggesting that foreign citizens who have attended medical schools abroad receive preferential licensing when compared with Americans who have attended medical schools abroad.[4]

---

**3.** As the Supreme Court held in *San Antonio School District v. Rodriguez, supra*, 411 U.S. at 33–34 [93 S.Ct. at 1296–1297], whether a right is considered "fundamental" depends on whether such right is "explicitly or implicitly guaranteed by the Constitution."

**4.** Arguably, this facially neutral classification may have a disproportionate impact on Americans. However, plaintiffs have made no attempt to show that a purpose to discriminate *against* Americans shaped the classification in use. *Cf., Personnel Administration of Mass. v.*

Plaintiffs first attack Texas' licensing scheme on grounds that it denies equal licensing treatment to persons similarly situated. They claim the provision requiring an applicant for an M.D. license to possess an M.D. degree is facially invalid because persons receiving D.O. degrees receive the same training and education as persons granted M.D. degrees. The parties have conceded that none of the evidence before the Court indicates that D.O.'s are more or less competent to practice the healing art.

According to the plaintiffs:

The study of "osteopathy" began in the nineteenth century as a unique approach to the healing art, using as its basic tenet the theory that the musculoskeletal system played an integral role in the overall health of human beings, and through a system of manipulative methodology, successful treatment could be achieved.

In the years since the inception of this theory, schools of osteopathy were founded relying upon this basic tenet, and shunning the use of surgery or drugs in health care.

Argument and Authorities, at 5. However, there is at present:

. . . no substantial difference between accredited medical schools irrespective of the terminology of the degree conferred *except that students attending medical schools conferring the degree "Doctor of Osteopath" are required to take and be examined in several courses in manipulative therapy.*

. . . Irrespective of the terminology of the degree conferred, all accredited medical schools have substantially the same curriculum and utilize the same texts. Stipulations, at 2.

Yet, the Court finds there is a difference in the education received by D.O.'s and M.D.'s.

Physicians who have attended schools granting D.O. degrees, unlike those who attended schools granting M.D. degrees, are required to take courses in "manipulative

*Feeney*, 442 U.S. 256, 272–81 [99 S.Ct. 2282, 2292–97, 60 L.Ed.2d 870] (1979); *Arlington*

therapy." Plaintiffs themselves took courses in "manipulative therapy" or osteopathy. Oral Deposition of Dr. John Maceluch, at 11; Oral Deposition of Dr. Robert A. Glick, at 49. This difference in curriculum is reflected, generally, in a different approach to healing. As the American Osteopathic Association argued,

It is already exceedingly difficult for a layman to make an intelligent choice of physicians. To allow physicians trained in osteopathic schools to use the designation, "M.D." would deprive a layman of one of the only methods available of differentiating between physicians. Osteopathic physicians have a unique contribution to make and offer the public a distinct option in health care.

Amicus Curiae Brief of the American Osteopathic Association, at 7.

Despite the fact that medicine is practiced within an objective scientific framework, the decisional processes of a physician reflect not only the aggregate of his substantive knowledge of clinical techniques, but also his judgment as to the need for, and nature of, treatment. That skill, born of experience, perception of human nature, and intuitions as to what is best for a patient, jumps over the many voids in "scientific" knowledge and separates the scientist from the doctor. It follows that two schools of medicine that advocate differing approaches, even if they differ only in their advocacy of differing philosophical approaches to the same scientific realities, present a difference that a legislature may note without unlawfully discriminating against one, or preferring one over the other. The harm plaintiffs point to flows from a public perception of these differences. The legislature has not caused these differences. It has only required that, because differences exist, they be identified.

The Court finds, therefore, as the three-judge district court found in *Oliver v. Morton*, 361 F.Supp. 1262, 1268 (N.D.Ga.1973) with respect to Georgia's statutory scheme prohibiting an alumnus of an osteopathic

*Heights v. Metropolitan Housing Authority*, 429 U.S. 252 [97 S.Ct. 555, 50 L.Ed.2d 450] (1977).

school from using the designation "M.D.," that the statutory requirement that physicians hold themselves out under the professional degree they received is a rational requirement. And whether or not plaintiffs actually use manipulative therapy in their practices does not affect the constitutionality of the statute as applied to them; the state's interest in ensuring accurate information on the schooling of physicians is enough to sustain the statute.

The second way equal protection is allegedly violated, both facially and as applied, is that graduates of foreign medical schools, who do not have degrees which read "Doctor of Medicine" or "Doctor" and which do not translate to a similar wording, can be licensed as M.D.'s while there is no procedure or means by which physicians such as plaintiffs who have received D.O. degrees may benefit from the M.D. designation.[5]

There are two primary methods for a student at a foreign medical school to be licensed in the United States. First, a student can take advantage of the "Fifth Pathway Program" provided by Article 4501b. This program allows a person who had completed all of the didactic (classroom) work at certain foreign medical schools, who goes on satisfactorily to complete one academic year of supervised clinical training under the direction of an American medical school, and who meets certain examination requirements to use the title "M.D." Or, as is the more typical case, the student can complete his medical education at his foreign medical school, in which case, after passing the Educational Council for Foreign Medical Graduates examination and FLEX (the examination required by the Board of all applicants for licensure), he can use the title "M.D."

The Court finds that equal protection has not been denied United States trained osteopaths by the differing licensing paths provided people who have attended foreign medical schools. The evidence shows that schools of osteopathy are virtually an American phenomenon.[6] There are few, if

---

**5.** *Tex.Rev.Civ.Stat.Ann.* art. 4501b provides:

Section 1. Notwithstanding any other provision of law, an individual who has been a student of a foreign medical school is eligible for licensure to practice medicine in this state if he has satisfied the following requirements:

(1) has studied medicine in a medical school located outside the United States which is listed by the World Health Organization;

(2) has completed all of the didactic work of the foreign medical school;

(3) has attained a score satisfactory to a medical school in the United States approved by the Liaison Committee on Medical Education on a qualifying examination and has satisfactorily completed one academic year of supervised clinical training for foreign medical students as defined by the American Medical Association Council on Medical Education under the direction of the medical school in the United States;

(4) has attained a passing score on the Educational Council for Foreign Medical Graduates examination, or other examination, if required by the State Board of Medical Examiners; and

(5) has passed the examination required by the State Board of Medical Examiners of all applicants for licensure.

In plaintiffs' supplemental brief, they argue that another reason why the existing licensing policies and procedures are unconstitutional as applied is that the great majority of foreign applicants are licensed by a method (the

ECFMG screening exam followed by the FLEX exam) provided neither by law nor by rule. The Court fails to see how this would render the practices unconstitutional as applied, even if true. This other pathway is implicitly provided by Art. 4501b Section 3. Article 4501b was passed against the background of the established pathway from foreign medical school graduation (ECFMG—FLEX—MD). The provision in Article 4501b Section 3 that certification by the ECFMG "should not be a condition of licensure for *candidates who have completed the requirements of Section 1 of this Act*" is only an implicit acceptance or authorization of the existing pathway. *See* Oral Examination of A. Bryan Spires, Jr. and Beverly Greenwood, at 71 (Spires) 80–81 (Spires).

**6.** Plaintiff Dr. Maceluch himself knows of no schools of osteopathic medicine outside the United States, and admits that "the osteopathic form of the practice of medicine" is confined to the United States. Oral Deposition of Dr. John Maceluch, at 32. *But see* Oral Examinations of A. Bryan Spires, Jr., M.D., and Beverly Greenwood, at 40 ("I believe there is one [school of osteopathy outside the U.S.]; but I don't know where it is. We have never had an applicant from there."). "Osteopathy was born in the United States and the philosophy and techniques have been developed almost exclusively in the United States." Amicus Curiae Brief of

any, foreign medical students similarly situated to plaintiffs. Moreover, it does not follow that osteopaths and graduates of foreign medical schools must be treated alike simply because foreign graduates, like plaintiffs, may not have had educational backgrounds identical to those attending American medical schools granting M.D. degrees. Plaintiffs, unlike all or substantially all foreign medical students, have taken courses in manipulative therapy in an osteopathic school.[7] What sets plaintiffs apart from M.D.'s, sets them apart from graduates of foreign medical schools as well.

In sum, the state has demonstrated a rational relationship between its licensing categories and debatable, if not real, differences between doctors possessing M.D. and D.O. degrees. That is all that the Constitution requires. *See Minnesota v. Clover Leaf Creamery Co.*, 49 U.S.L.W. 4111, 4113 [449 U.S. 456, 462, 101 S.Ct. 715, 723, 66 L.Ed.2d 659] (January 21, 1981).[8] Whether Texas' licensing designations overstate existing differences in an attempt to facilitate public awareness of the distinct osteopathic approach to the art of healing is immaterial in equal protection analysis. It is enough that the Texas Legislature "could rationally have decided" that the differences exist, and warranted a separate designation for purposes of public identification. *Id.* at 4114 [449 U.S. at 465, 101 S.Ct. at 724]. Measured against this standard, Texas' licensing scheme for physicians easily withstands constitutional scrutiny.

## II.

Plaintiffs also rely on Article 16, Section 31 of the Texas State Constitution to attack the Board's authority to deny them use of the M.D. designation. Section 31 provides in pertinent part:

> The Legislature may pass laws prescribing the qualifications of practitioners of medicine in this state . . . but no preference shall ever be *given by law* to any schools of medicine. (emphasis supplied)

They assert that foreign schools of medicine are being given preference because M.D. Licenses are issued even as to those foreign graduates who did not obtain such a degree.

For the reasons earlier discussed, the Court concludes that there is no preference prohibited by Article 16, § 31. In requiring graduates of medical schools rooted in different approaches to the medical art to reflect their differences in distinctive degree designations, the legislature is not *preferring* one school over the other. That M.D.'s may command a larger following is a choice of consumers of medical services, not the legislature. That is not a preference "given by law."

## III.

Finally, plaintiffs assert that their first amendment rights are being violated by defendants in view of the allegedly generic nature of the designation, "M.D." This same argument was rejected in *Oliver v. Morton, supra*, 361 F.Supp. at 1270, and must be rejected here, albeit for different reasons.

In *Friedman v. Rogers*, 440 U.S. 1 [99 S.Ct. 887, 59 L.Ed.2d 100] (1979), the Supreme Court faced the constitutionality of a Texas law prohibiting the practice of op-

---

the American Osteopathic Association, at 18. "[F]oreign physicians are not trained at osteopathic schools. . . ." Supplemental Amicus Curiae Brief of the American Osteopathic Association, at 11. *See also* Oral Examinations of A. Bryan Spires, Jr., M.D., and Beverly Greenwood, at 39–40, and 87.

7. There is no evidence of any person who attended a foreign school of osteopathy who applied for and received an "M.D." designation. *See* Oral Examinations of A. Bryan Spires, Jr., M.D. and Beverly Greenwood, at 87.

8. In *Minnesota v. Clover Leaf Creamery Co.*, Justice Brennan stated for a majority of the Court:

> States are not required to convince the courts of the correctness of their legislative judgments. Rather, "those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Vance v. Bradley*, 440 U.S. 93, 111 [99 S.Ct. 939, 949, 59 L.Ed.2d 171] (1979).

tometry under a trade name, assumed name, or corporate name. The dispute arose from friction between "professional" and "commercial" optometrists. Though all optometrists were subject to the same licensing requirements and the same laws regulating their practices, they divided themselves informally into two groups based on their approaches to optometry. *Id.* at 5 [99 S.Ct. at 891]. The Court analyzed the constitutionality of the restrictions under the commercial speech standards enunciated in *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council*, 425 U.S. 748 [96 S.Ct. 1817, 48 L.Ed.2d 346] (1976). In that case, the Court held that restrictions on false, deceptive, and misleading commercial speech are permitted under the First Amendment. *Friedman v. Rogers, supra*, 440 U.S. at 9 [99 S.Ct. at 893]. When applied to the statute considered in *Rogers*, the Court concluded that the state's interest in protecting the public from the deceptive and misleading use of optometrical trade names was "substantial and well demonstrated" and, therefore, permissible. *Id.* at 15 [99 S.Ct. at 897].[9]

Plaintiffs urge that the term "M.D." has become so synonymous in the public mind with qualified, licensed physicians, that to prevent osteopaths from describing themselves as M.D.'s will confuse the public as to the true nature of their profession and training. Conceding that some members of the public may indeed comprehend the term M.D. to connote competent physicians, it is not irrational for the state to conclude that for plaintiffs to use the designation "M.D." would nevertheless deceive those who know

the difference between doctors who received M.D. degrees and D.O. degrees. Curiously, plaintiffs emphasize numerous instances where their possession of a D.O. rather than an M.D. degree led physicians with M.D.'s to view them with suspicion. This argument only suggests a rational basis for the legislative decision. Evidently, the market cares about the distinction. Courts should not end the dissemination of information reasonably perceived by the legislature to be useful to the functioning of the market, whether the Court thinks the market is correct in any normative sense.

Plaintiffs' plight is not without appeal. The substantive content of the education and the level of clinical skills imparted to those graduating from osteopathic schools does not differ materially from that received by those who have graduated from schools graduating M.D.'s. Yet, osteopaths face a uniform licensing exam, and are likely to enjoy fewer financial and professional benefits from their calling. Still, the similar substantive content and skill level of osteopaths does not alter the fact that the osteopathic school which trained the plaintiffs has historically emphasized a different approach to the art of medicine. At least one solution is for the less well known D.O.'s themselves to provide the marketplace with the information necessary to make an informed choice.[10] Where the legislature has implicitly required this solution, it is not for the courts to say otherwise.

This court does not sit *de novo* as a legislative body, nor will it do so under the cloak of equal protection. A federal court

---

**9.** *Friedman* indicates a "new willingness by the Supreme Court to defer to state legislatures in their regulation of economic activity, even when that regulation incidentally affects commercial speech." Note, *Reuniting Commercial Speech and Due Process: The Standard for Deceptiveness in Friedman v. Rogers*, 57 Tex.L. Rev. 1456, 1484 (1979). "Because of the special character of commercial speech and the relative novelty of First Amendment challenges for such speech, we act with caution in confronting First Amendment challenges to economic legislation that serves legitimate regulatory interests." *Friedman v. Rogers, supra*, at 11 n.9 [99 S.Ct., at 895 n.9].

**10.** As the American Osteopathic Association states:

[T]he continued use of the differing designations "D.O." and "M.D." is not only necessary to preserve the integrity of the osteopathic profession but necessary to inform the public and allow a patient to make an intelligent choice of physicians. Osteopathic medicine has a long and proud tradition and maintaining its "separate but equal" status in the ever-changing world of modern medicine is as vital to the profession as it is to the community at large. Amicus Curiae Brief of the American Osteopathic Association, at 3.

decree is clean, swift, and difficult to overturn. Its powers attract those who have lost in the rough and tumble of legislative politics, but its power is undemocratic and antimajoritarian. Accordingly, the rationale for the exercise of judicial power requires, at the least, that the "constitutional" interest impinged by the legislature be one traceable to the Constitution. The Court has no veto. That belongs to the governor. And saying it is the Constitution that vetoes does not make it so.

Judgment is hereby entered for defendants in all respects.

/s/ Patrick E. Higginbotham
PATRICK E. HIGGINBOTHAM
United States District Judge