Dr. Theodore S. BRANDWEIN,
Plaintiff-Appellant,

v.

The CALIFORNIA BOARD OF OSTEO-
PATHIC EXAMINERS; The California
Board of Medical Quality Assurance;
The California Department of Consumer
Affairs; and Edwin L. Miller, District
Attorney for the County of San Diego,
State of California, Defendants-Appel-
lees.

No. 81–5343.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 3, 1982.

Decided June 24, 1983.

As Amended Aug. 10, 1983.

Dr. Theodore S. Brandwein, plaintiff-appellant, pro se.

M. Gayle Askren, Deputy Atty. Gen., Greer D. Knopf, San Diego, Cal., Alexander R. Tobin, Upland, Cal., for defendants-appellees.

Before SNEED, POOLE, and BOOCHEVER, Circuit Judges.

POOLE, Circuit Judge:

Plaintiff-appellant Dr. Theodore S. Brandwein is a physician holding the degree of Doctor of Osteopathy (D.O.). Brandwein challenges the constitutionality of California Law, under which a D.O. may not hold himself out as a Doctor of Medicine (M.D.). He alleges that the law violates the First Amendment and the Equal Protection Clause of the federal constitution. Following the dismissal of these and pendant state claims in district court, Brandwein appeals.

*Background*

### 1. Allopathy and Osteopathy

An understanding of Brandwein's constitutional claims requires some explanation of the development of osteopathy and the state's attempt to regulate it. Allopathy, as originally understood, was a system of treating disease based on inducing an opposite reaction in the body. Steadman, *Medi-*

cal Dictionary 45 (1976). It has gradually become associated with the type of medicine taught in medical schools awarding a Doctor of Medicine (M.D.) degree. Osteopathy is a school of medicine founded by Dr. Andrew Taylor Still in the late 19th century. It is based on the principal that the body contains its own defense mechanisms against disease and that, through the process of physical manipulation of skeletal and muscular tissues, it may be brought back to health. Steadman, *supra*, at 1004.

While in its early development osteopathy was primarily a drugless, non-surgical form of medical treatment, it has since moved much closer to the allopathic school of medical practice. *Oliver v. Morton*, 361 F.Supp. 1262, 1264 (N.D.Ga.1973). At the present time the differences between the schools of osteopathy and allopathy are minor; often the same basic curricula and texts are used. *Id.* Osteopaths are admitted to internships and residencies approved by the American Medical Association (A.M.A.), and local medical associations are allowed to accept osteopaths as members and such osteopaths are then eligible for membership in the A.M.A. *Id.* California law now provides that "holders of M.D. degrees and D.O. degrees shall be accorded equal professional status and privileges as licensed physicians and surgeons." Cal.Bus. & Prof.Code § 2453 (West 1974 & Supp.1983) (hereinafter "Medical Practice Act").

### 2. Regulation by the State

Prior to 1922, the California State Board of Medical Examiners (hereinafter "Medical Board") was responsible for the licensing and supervision of osteopathic as well as allopathic physicians. Because of continuing tensions between the members of the two groups, the osteopaths sought the creation of an independent Board of Osteopathic Examiners (hereinafter "Osteopathic Board"). In 1922, they succeeded in obtaining passage of an initiative measure which established such a board, with the result that the Medical Board continued to issue licenses to physicians holding an M.D. degree, and the Osteopathic Board began to issue the same license to holders of D.O.

degrees, both under identical legislative standards of education and examination. *Board of Osteopathic Examiners v. Board of Medical Examiners*, 53 Cal.App.3d 78, 81, 125 Cal.Rptr. 619, 621 (Cal.Ct.App.1975).

As the two practices become more similar, hostility between them lessened. In 1961, the California Medical Association and the California Osteopathic Association signed an agreement to unify the two organizations. *Board of Osteopathic Examiners v. Board of Medical Examiners*, 53 Cal. App.3d at 81–82, 125 Cal.Rptr. at 621. The agreement provided that arrangements would be made to provide existing osteopaths in California with an M.D. degree. They would then have become subject to the jurisdiction of the Medical Board. At the same time, the Osteopathic Board was to be stripped of its power to license any new osteopaths. The parties agreed to jointly sponsor legislation to achieve these ends.

As part of the agreement, the sole school of osteopathy in California, the College of Osteopathic Physicians and Surgeons, was converted to a medical school, and is presently known as the University of California Medical School at Irvine. It was then arranged for this new medical school to issue M.D. degrees to those doctors of osteopathy presently licensed to practice in California. *See Osteopathic Physicians & Surgeons v. Cal. Medical Assn.*, 224 Cal.App.2d 378, 392, 36 Cal.Rptr. 641, 649 (Cal.Ct.App.1964). The state legislature then amended § 2275 of the Medical Practice Act to permit licensees of the Osteopathic Board holding an M.D. degree issued prior to September 30, 1962 to use the term M.D. Approximately 2,500 osteopaths employed this one-time opportunity to become M.D.s. *Board of Osteopathic Examiners v. Board of Medical Examiners*, 53 Cal.App.3d at 83, 125 Cal.Rptr. at 622. Finally, the two organizations were successful in gaining the passage of an initiative by the voters entitled the Osteopathic Act of 1962. This Act placed the newly-created M.D.s under the jurisdiction of the Medical Board and barred licensing of new osteopaths in the state. *See Osteopathic Act of 1962, Stats. 1st Ex.Sess.1962, ch. 48.

Then, in 1974, this framework of cooperation collapsed when the California Supreme Court declared the 1962 Act unconstitutional. In *D'Amico v. Board of Medical Examiners,* 11 Cal.3d 1, 112 Cal.Rptr. 786, 520 P.2d 10 (Cal.1974), the state Supreme Court held that the 1962 initiative Act's prohibition of future licensing of osteopaths violated the Equal Protection Clause of both the federal and state constitutions, because the state could not demonstrate a rational relation to a legitimate governmental objective. *D'Amico v. Board of Medical Examiners,* 11 Cal.3d 24, 112 Cal.Rptr. at 803, 520 P.2d 10. Following the *D'Amico* decision, the Osteopathic Board resumed granting licenses to osteopaths under its original authority granted by the 1922 Act, and the two Boards, the Medical Board and the Osteopathic Board, resumed their traditional practice of separate jurisdiction and authority over their licensees.

3. Claims raised by Dr. Brandwein

Dr. Brandwein received a D.O. degree from the Kansas City College of Osteopathic Medicine. In 1975 he was licensed as a physician and surgeon by the Osteopathic Board pursuant to § 2450 of the Medical Practice Act. Brandwein then apparently began representing himself as an M.D., even though he had not received that degree from a medical school. In 1979 the District Attorney's Office for the County of San Diego charged Dr. Brandwein with misrepresenting himself as an M.D. in violation of § 2054 of the Medical Practice Act. The charges were later dropped.

Shortly afterwards, Dr. Brandwein brought this action against the appellees. Brandwein essentially raised three claims: (1) that the existing state regulatory scheme, which prevents him from using the title "M.D.," violates his right to free expression under the First Amendment; (2) that the California Medical Practice Act is in violation of the Equal Protection Clause because it permits graduates of foreign medical schools and osteopaths who participated in the 1961–62 merger between the medical and osteopathic professions to use the title "M.D." in California, while denying him the same privilege; and (3) that the regulations promulgated by the Osteopathic Board at Title 16, §§ 1606, 1695 of the California Administrative Code (which requires osteopaths to display the term "D.O." outside their offices and provides for continuing education courses for osteopaths), violate the California Administrative Procedure Act because they are in excess of the powers committed to the Osteopathic Board.

I. The First Amendment Claim

Dr. Brandwein asserts that the state regulatory scheme violates the First Amendment because he is forced to identify himself by the title "D.O.," which is associated with a particular philosophy of medical practice. Instead, Dr. Brandwein claims that his personal philosophy of medicine is best reflected by the title "M.D." and that he should be able to express himself by using that term. The district court rejected Dr. Brandwein's claim, holding that "the state simply intends every person engaged in some professional activity to properly represent himself in his true capacity and by an appropriate title."

Notwithstanding Dr. Brandwein's attempt to characterize the degrees as terms of medical philosophy, the M.D. and D.O. titles are degrees conferred by academic institutions; and the use of the title M.D. or D.O. constitutes a representation to the public concerning the particular educational qualifications of the holder. We note also that to the extent Dr. Brandwein is correct in that such a degree identifies its holder with a particular school of medical thought, that association arises because the individual chose to attend that school.

Because the use of a degree is in effect a representation to the public concerning the holders academic training and qualifications, one which the public may rely on in selecting a physician, it is closer to a form of commercial speech than a philosophical statement. *See In Re Primus,* 436 U.S. 412, 438 n. 32, 98 S.Ct. 1893, 1908 n. 32, 56 L.Ed.2d 417 (1978); *Central Hudson Gas v. Public Service Commission of New*

*York,* 447 U.S. 557, 563–64, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980). And in dealing with commercial speech, the Supreme Court has emphasized that "restrictions on false, deceptive, and misleading commercial speech" are permissible. *Friedman v. Rogers,* 440 U.S. 1, 9, 99 S.Ct. 887, 894, 59 L.Ed.2d 100 (1980). *See also E.F. Drew & Co. v. Federal Trade Commission,* 235 F.2d 735, 740 (2d Cir.1956), *cert. denied,* 352 U.S. 969, 77 S.Ct. 360, 1 L.Ed.2d 323 (1957) (no constitutional right to disseminate false or misleading advertisements). Accordingly, we find that Dr. Brandwein's First Amendment rights are not violated by the state's refusal to allow him to hold himself out to the public under a degree which he has not earned. *Oliver v. Morton,* 361 F.Supp. 1262, 1269–70 (N.D.Ga.1973).

## II. The Equal Protection Claims

Dr. Brandwein contends that he is being denied equal protection of the laws because three distinct groups of medical licensees in California have been permitted electively to use the title "M.D." while the same privilege has been denied him. In effecting this discrimination, Dr. Brandwein alleges, the state not only violates its own statutory policy of according equal professional status and privileges to holders of M.D. degrees and D.O. degrees, but the effect is professional and economic detriment. The three classes granted favored treatment identified by Dr. Brandwein are:

(1) Foreign-educated doctors who had not been granted the "M.D." degree by their medical schools;

(2) Osteopathic physicians educated in the United States who had been granted the "M.D." degree in California as part of the attempted merger between the two fields in 1961–62;

(3) Graduates of osteopathic schools who had obtained private legislation from the California legislature providing for their licensing by the Medical Board.

In reviewing Dr. Brandwein's equal protection claims, we note initially that the proper standard for such review is the rational basis test. *Massachusetts Board of*

*Retirement v. Murgia,* 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976). Strict scrutiny is the proper test of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class. *Id.* The claim here does not involve either of those circumstances.

In *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 942–43, 59 L.Ed.2d 171 (1979), the Supreme Court reiterated the basis of the rational relation test:

> The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted. Thus, we will not overturn such a statute unless the varying treatment of different persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.

In general, the Court has been especially deferential to legislative classifications in cases of challenges to the state regulation of licensed professions. *See, e.g., Watson v. Maryland,* 218 U.S. 173, 30 S.Ct. 644, 54 L.Ed. 987 (1910); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). *See also Ohralik v. State Bar Assn.,* 436 U.S. 447, 460, 98 S.Ct. 1912, 1920–21, 56 L.Ed.2d 444 (1978) ("the State bears a special responsibility for maintaining standards among members of the licensed professions").

In applying the rational relation test, the Court has also stressed the heavy procedural burden placed upon the plaintiff in proving his case. The plaintiff in a challenge to a legislative classification, reviewed under this standard, must prove that the facts on which the legislature may have relied in shaping the classification "could not reasonably be conceived to be true by the governmental decisionmaker." *Vance v. Bradley,* 440 U.S. at 111, 99 S.Ct. at 949. "The admission that facts are argu-

able" is enough to justify the legislative judgment. *Id.* at 112, 99 S.Ct. at 950. And in reviewing the rationality of the classification, a court may hypothesize legislative purposes: "where there are plausible reasons for Congress' action, our inquiry is at an end. It is, of course, 'constitutionally irrelevant whether this reasoning in fact underlay the legislative decision,' *Flemming v. Nestor,* 363 U.S. [603], at 612 [80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435], because this Court has never insisted that a legislative body articulate its reasons for enacting a statute." *United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980).

Accordingly, the district court acted properly in dismissing Dr. Brandwein's equal protection claim if there is a conceivable legitimate purpose which would justify the distinctions made in the state's regulatory scheme. *See Lamb v. Scripps College,* 627 F.2d 1015, 1021 (9th Cir.1980).

1. Osteopaths permitted to become M.D.s in the 1961–62 merger

Dr. Brandwein asserts that § 2275 of the Medical Practice Act violates the Equal Protection Clause because it permits those osteopaths whose D.O.s were "converted" to M.D.s during the short-lived merger in 1961–62 now to use the "M.D." title while denying him the same privilege. This distinction is claimed to be irrational because if the state is truly concerned with disclosure of a physician's actual educational qualifications, no reason exists to treat Dr. Brandwein any differently from the 2,500 osteopaths who took advantage of the opportunity to convert their degrees in 1961–62.

It is undeniable that there is an inconsistency between the state's position reflected in § 2275 of the Medical Practice Act, the basis for a wholesale conversion of D.O.s to M.D.s, and the position presently enforced by the state, that post 1974 licentiates of the Osteopathic Board may not acquire the suffix "M.D." This is an anomaly resulting from the convoluted history of the relationship between the osteopathic and medical

professions in the State of California. In 1961–62, there can be little doubt that California's plan to "grandfather" existing osteopaths into the ranks of M.D.s was rationally related to the state's broader plan of prohibiting future licensing of osteopaths and merging the two professions. That overall plan was aborted in 1974 when the California Supreme Court concluded that the plan unconstitutionally denied equal protection insofar as it prohibited future licensing of osteopaths in the state. *D'Amico v. Board of Medical Examiners,* 11 Cal.3d 1, 22, 112 Cal.Rptr. 786, 801, 520 P.2d 10 (Cal.1974). When the two professions resumed their traditional practice of separate licensing and regulation following the *D'Amico* decision, the 2,500 converted M.D.s were not forced to surrender their newfound standing as M.D.s and return to using the title D.O.

The resulting distinction, that osteopaths licensed prior to 1962 and who took advantage of the conversion offer may now use the M.D. title while others, such as Dr. Brandwein, are prohibited from doing the same, could best be described as an accident of history. That does not make the legislative decisions involved in creating that distinction irrational, however. It is conceded that legislative decision to merge the two professions in 1962 bore a rational relation to a legitimate state interest. Nor is the later legislative decision to return to the traditional separation of the professions, in light of the *D'Amico* decision, challenged as an "irrational choice" by appellant. Dr. Brandwein's position is essentially that since the legislature once permitted osteopaths to adopt the title M.D., it became thereby obligated in perpetuity to grant all future osteopaths the same privilege. The implication that the Equal Protection Clause prohibits the legislature from ever taking inconsistent or differing approaches to a particular problem is contrary to the very premise of the rational relation test. The Supreme Court has stressed that the legislature may take piecemeal steps which only partially ameliorate a perceived evil and create some disparate treatment of af-

fected parties. *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 466, 101 S.Ct. 715, 725, 66 L.Ed.2d 659 (1981); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955); *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976). The state does not violate the Equal Protection Clause "merely because the classification made by its laws are imperfect." *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 316, 96 S.Ct. 2562, 2568, 49 L.Ed.2d 520 (1976), *quoting Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970).

### 2. Graduates of Foreign Medical Schools

Dr. Brandwein also raises an equal protection claim based on the differences in treatment accorded under state law between osteopaths and graduates of foreign medical schools. Graduates of foreign medical schools who do not have degrees which translate to "Doctor of Medicine" or "Doctor" or to similar wording may still be accorded the M.D. designation if licensed by the Medical Board. *See* Medical Practice Act, § 2055. Because osteopaths fall under the exclusive regulatory jurisdiction of the Osteopathic Board, no similar method allows Dr. Brandwein to qualify for the M.D. title. He asserts that the state has thereby drawn an irrational distinction between domestic osteopaths and foreign medical school graduates.

■■■■ We hold that Dr. Brandwein's equal protection rights have not been violated by the provision for differing licensure procedures for those who attend foreign medical schools. All that is needed for this court to uphold the state regulatory scheme is to find that there are "plausible," *United States Railroad Retirement Board v. Fritz,* 449 U.S. at 179, 101 S.Ct. at 461, "arguable," *Vance v. Bradley,* 440 U.S. 112, 99 S.Ct. at 950, or "conceivable," *id.* at 111, 99 S.Ct. at 949–50, reasons which may have been the basis for the distinction. Whether

these reasons in fact underlay the legislative action is "constitutionally irrelevant." *Flemming v. Nestor,* 363 U.S. 603, 612, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960).

At the outset, we note that the issue is not whether osteopaths are less competent in the art of healing than M.D.s, whether trained abroad or in the United States. Appellees have not alleged that osteopaths are less competent than M.D.s, and numerous courts faced with the same issue have found that osteopaths are equally qualified as graduates of medical schools to perform the practice of medicine. *Maceluch v. Wysong,* 680 F.2d 1062, 1065 (5th Cir.1982); *Oliver v. Morton,* 361 F.Supp. at 1268; *D'Amico v. Board of Medical Examiners,* 11 Cal.3d at 802, 112 Cal.Rptr. at 22, 520 P.2d 10. In California, the regulatory framework ensures that osteopaths and M.D.s are equally qualified to practice medicine. Defendants conceded that all physicians and surgeons, whether licensed by the Medical Board or the Osteopathic Board must comply with the same examination requirements under the Medical Practice Act. *See* Medical Practice Act § 2080; *Gamble v. Board of Osteopathic Examiners,* 21 Cal.2d 215, 217, 130 P.2d 382, 383–84 (Cal.1942).

It is also not in dispute that foreign medical graduates often hold degrees which differ from the traditional "M.D." or "Doctor of Medicine" degree in this country,[1] yet are granted the privilege of using the title "M.D." *See* Medical Practice Act § 2100 *et seq.* Further, the training received by foreign medical graduates may differ substantially from that received by graduates of United States medical schools, and in California this difference is deemed sufficient to warrant extensive regulations governing the premedical and medical education requirements, as well as the clinical training and hospital service requirements of foreign medical school graduates. *See* Medical Practice Act § 2101; 16 Cal.Adm.Code §§ 1322–25.

---

1. In England, medical school graduates receive an M.B. degree; in Scotland, a "Conjoint Certificate"; in Ireland, an "M.B.B.S.;" Norway, a "Candidate in Medicine;" and in Spain, a "Licentiate in Medicine & Surgery."

We think the central issue is not competency, but rather whether there exists a difference in training or philosophy between medical schools and osteopathic schools which is "arguably" or "plausibly" a legitimate basis for the classification made by the legislature. *Vance v. Bradley,* 440 U.S. at 112, 99 S.Ct. at 950; *Flemming v. Nestor,* 363 U.S. at 612, 80 S.Ct. at 1373. We believe such a difference exists. Uncontradicted testimony before the district court established that, in addition to testing for competency in all areas of medical practice, the Osteopathic Board also tests the candidate's understanding of osteopathic concepts. This area is not examined by the Medical Board. The additional area of examination reflects the mandatory training in osteopathic techniques and theory at schools of osteopathic medicine, which is not mandatory at allopathic medical schools. *Maceluch v. Wysong,* 680 F.2d at 1066; *Oliver v. Morton,* 361 F.Supp. at 1264–65. This difference in curriculum reflects the long history of the separate philosophy associated with osteopathic medicine, and provides the osteopathic physician with a unique and distinct educational training which may affect "not only the aggregate of his substantive knowledge of clinical techniques, but also his judgment as to the need for, and nature of, treatment." *Maceluch v. Wysong,* 680 F.2d at 1066. *See also Oliver v. Morton,* 361 F.Supp. at 1268; *Eatough v. Albano,* 673 F.2d 671, 676–77 (3d Cir.), *cert. denied,* 457 U.S. 1119, 102 S.Ct. 2931, 73 L.Ed.2d 1331 (1982).[2] The fact that D.O.s have been uniquely trained in osteopathic, manipulative techniques, preferred by some members of the public, suggests that the designation of the degree M.D. or D.O. helps the public in selecting a physician. *Eatough v. Albano,* 673 F.2d at 676; *Oliver v. Morton,* 361 F.Supp. at 1268.

The fact that foreign medical school graduates are permitted to use the M.D. degree in no way undermines the rationality of the legislature's decision that osteopaths be distinguished from graduates of medical schools. There might well be a plausible equal protection claim if graduates of foreign osteopathic schools were permitted to use the M.D. title in California; but in this case, no such showing has been made.[3] The legislative decision to allow foreign medical graduates to use the M.D. title is consistent with the rational conclusion that osteopaths have different training from M.D.'s and should be identified as such. "[I]t does not follow that osteopaths and graduates of foreign medical schools must be treated alike simply because foreign graduates, like [the plaintiff], may not have had educational backgrounds identical to those attending American medical schools granting M.D. degrees." *Maceluch v. Wysong,* 680 F.2d at 1068. It is the differences in general philosophy, manifested by the additional training in osteopathic schools, which motivates the basic distinction between M.D.s, whether foreign or domestic medical school graduates, and osteopathic school graduates.

Dr. Brandwein's reliance on *Oliver v. Morton,* 361 F.Supp. 1262 (N.D.Ga.1974) is unavailing. *Oliver* involved a successful equal protection challenge to the medical licensing scheme in Georgia. There all physician licenses were issued by a Composite Medical Board and the Board permitted graduates of foreign medical schools to use the term M.D. while denying the same privilege to osteopaths. A three-judge court rejected the two possible rationales suggested by the state for such disparate treatment. The state first argued that the degrees conferred by foreign medical schools were substantially equivalent to the M.D.

**2.** The California Supreme Court, in *D'Amico v. Board of Medical Examiners,* 11 Cal.3d 22, 112 Cal.Rptr. 786, 520 P.2d 10 (1974), did not determine otherwise. It determined only that osteopathy constituted a legitimate and complete school of medicine which could not be completely banned from the state; the Court reserved the issue of whether there were signifi-

cant differences in emphasis and quality between osteopathic and allopathic training. 112 Cal.Rptr. at 803, 11 Cal.3d at 24, 520 P.2d 10.

**3.** It is not certain on this record that schools of osteopathic medicine exist outside the United States. *See Maceluch v. Wysong,* 680 F.2d 1062, 1067 (5th Cir.1982).

degree; the court, however, found that the D.O. degree was also substantially equivalent. The state also argued that foreign medical school degrees may confuse the public; the court determined that D.O. degrees suffered the same deficiency.

*Oliver,* however, is distinguishable from this case. First, the regulatory framework is different: while Georgia had no provision explicitly providing for the licensing of foreign medical school graduates, California has extensive educational, clinical, and examination requirements which must be satisfied. *See* Medical Practice Act §§ 2101, 2102. Further, the *Oliver* court chose not to stress the interest the public has in selecting a medical practitioner and of being fully informed of the physician's training and philosophy. We find this to be a valid classification, even if particular individuals such as Dr. Brandwein no longer accept the principles of osteopathy. *Massachusetts Board of Retirement v. Murgia,* 427 U.S. at 316, 96 S.Ct. at 2568.

In short, we cannot say that the district court erred in finding that a rational relationship exists between the separate classifications of D.O.s and M.D.s, and a plausible or conceivable difference between the training received by holders of those degrees which may affect the public's choice of physicians. That is all that is required by the Equal Protection Clause. *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. at 462, 101 S.Ct. at 723.

3. Osteopaths who have obtained private legislation

Dr. Brandwein further alleges that he has been denied equal protection of the laws because certain individuals have obtained special legislation from the state legislature permitting them to use the title M.D. despite the fact that they received degrees as Doctors of Osteopathy.

The procedural history of this claim differs from that of the other equal protection claims. The first two equal protection claims were raised as separate counts in Dr. Brandwein's six-count complaint filed with the district court. Following the defend-

ants' motions to dismiss, Dr. Brandwein moved for summary judgment. In the affidavit filed in support of plaintiff's motion for summary judgment, Dr. Brandwein raised the additional issue of osteopaths who had obtained special legislation. He did not seek to amend his original complaint to include this additional issue. The district court then dismissed each count of Dr. Brandwein's complaint and also, without comment, denied the motion for summary judgment.

If this were a separate claim for relief, we would be without jurisdiction to pass on it, because it was not properly raised before the district court. *See* Fed.R.Civ.P. 15(a); 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1474 (1971). Without an amendment to the complaint incorporating this new issue, it was not before the district court for judgment and is not now reviewable by this court, at least insofar as we review the correctness of the district court's order of dismissal.

This issue may, however, be construed as an additional argument or theory in support of the more general equal protection claim raised by Dr. Brandwein. Because the new argument was not raised by amendment to the complaint, but rather in an affidavit in support of plaintiff's motion for summary judgment, a different standard of review applies. To find the district court's denial of plaintiff's motion for summary judgment to be erroneous, we must find that plaintiff demonstrated that no genuine issue of material fact remained on this point. Given the meager nature of the allegations raised by Dr. Brandwein, we cannot so hold.

In the affidavit, Dr. Brandwein alleges at paragraphs 12 and 51 that some osteopathic graduates have been licensed by the Medical Board and use the title M.D., through special legislation or statutory interpretation. No further information is given. This is insufficient to support a summary judgment motion, Fed.R.Civ.P. 56; 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2738, at 438, and the district court properly denied

the motion. Further, the only instance of special legislation noticed to this court was closely related to the unique historical circumstances surrounding the attempted merger of the osteopathic and medical fields and the later court invalidation of that merger. *See Board of Osteopathic Examiners v. Board of Medical Examiners,* 53 Cal.App.3d 78, 82, 125 Cal.Rptr. 619 (Cal.Ct. App.1975). As our previous discussion of the merger attempt indicates, the now seemingly inconsistent legislative positions taken on the granting of M.D. titles to osteopaths cannot be deemed irrational choices.

III. Application of the Burford Abstention Doctrine

The district court dismissed with prejudice Dr. Brandwein's challenge to the regulations promulgated by the Osteopathic Board on the ground that abstention was appropriate under the principles set out in *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

 It appears that invocation of the abstention doctrine was unnecessary in this case. Aside from one equal protection claim, properly rejected by the district court,[4] plaintiff contests the regulations principally on state law grounds. The regulations[5] are claimed to violate the California Administrative Procedure Act, because they fail to refer to the statutory authority under which they were adopted, and because they are in excess of the authority granted to the Osteopathic Board. As such, these are state law pendant claims which should have been dismissed without prejudice when the federal claims were dis-

missed. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Lamb v. Scripps College,* 627 F.2d at 1018; 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3567 (1975 & Supp.1982). Even if the district court were correct in dismissing under the *Burford* doctrine, the dismissal should have been without prejudice. *See Santa Fe Land Improvement Co. v. City of Chula Vista,* 596 F.2d 838 (9th Cir.1979). Accordingly, we remand to the district court with instructions to dismiss without prejudice Counts Five and Six, the challenges to the Osteopathic Board regulations.

*Conclusion*

The district court properly dismissed Dr. Brandwein's complaint insofar as it challenged the state's denial of the title "M.D." under the First Amendment and the Equal Protection Clause. As a number of other courts have noted, it may be that the desired relief from the "onus" of the D.O. degree lies more properly in a program of public education by osteopaths themselves than in court-ordered remedies. *See Maceluch v. Wysong,* 680 F.2d 1069; *Oliver v. Morton,* 361 F.Supp. at 1268. Accordingly, we affirm the district court's dismissal of counts One to Four of the Complaint and the denial of plaintiff's motion for summary judgment.[6] We reverse the district court's dismissal with prejudice of counts Five and Six, pertaining to state regulatory challenges, and remand with instructions to dismiss those counts without prejudice.

AFFIRMED in part, and REVERSED and REMANDED in part.

4. Dr. Brandwein claimed that the regulation requiring osteopaths to display the title D.O. outside their office is a violation of equal protection because the Medical Board has no comparable regulation. The district court dismissed this claim without discussion. Since members of the public may assume that all physicians hold an M.D. degree, the state, as suggested above, has an interest in making sure that they are informed of a physician's actual educational background. Therefore, the regulation clearly appears to satisfy the rational relation test.

5. The regulations challenged by plaintiff are: 16 Cal.Adm.Code §§ 1606 (public display at medical office of D.O. degree), 1695 (continuing medical education for osteopaths), and 1695.-1–.4 (delegation of regulatory authority to Osteopathic Board).

6. Because we affirm the dismissal of all counts of the complaint against all parties, we need not reach the correctness of the district court's dismissal of all claims against the California Department of Consumer Affairs.